Kathryn R. GENTRY, Movant,

v.

Thomas E. GENTRY, Respondent.

Thomas E. GENTRY, Cross–Movant,

v.

Kathryn R. GENTRY, Natalie S. Wilson and Gess, Mattingly, Saunier and Atchison, Cross–Respondents.

Nos. 89–SC–501–DG, 89–SC–726–DG.

Supreme Court of Kentucky.

Nov. 8, 1990.

Walter R. Morris, Jr. and Natalie S. Wilson, Gess, Mattingly, Saunier & Atchison, Lexington, for movant, cross-respondents.

Glen S. Bagby, Brock, Brock & Bagby, Lexington, for respondent, cross-movant.

JAMES G. SHEEHAN, Jr., Special Justice.

Kathryn R. Gentry and Thomas E. Gentry were married February 26, 1975. It was the second marriage for both. Each had two children at the time they married. Both Tom and Kathy had been through protracted divorce proceedings and Kathy was aware that Tom's divorce and property settlement had been particularly bitter.

A few days before their wedding, Tom and Kathy executed a document titled "ANTENUPTIAL AGREEMENT", the preamble to which recited as follows:

> Whereas Tom and Kathy contemplate entering into marriage and each are [sic] possessed of property in his and her own right, and each has children by a former marriage, and

> Whereas, it is desired by Tom and Kathy that their marriage shall not in any way change their legal property rights or the rights of their children or heirs at law to the property of each of them as they presently are before the marriage of Tom and Kathy, or their rights to bequeath property by their last will and testament as they see fit.

The agreement disclosed the nature and value of Tom's and Kathy's respective assets. Tom's net worth was approximately 1,500,000.00. Kathy's was nominal. The essential, or operative, terms of the agreement were reciprocal releases:

> 3. Tom hereby renounces and releases to Kathy, her heirs and assigns, any and all right, title and interest or right of dower and courtesy [sic] to any property both real and personal of which Kathy may now be seized [sic] or that she may hereafter acquire. Tom further specifically renounces and releases to Kathy's heirs-at-law, next of kin, legatees and devisees under her Last Will and Testament should Kathy predecease him, any and all right, title, interest and right of dower and courtesy [sic] of which Tom may have or be entitled, both real and personal. Tom further agrees to make no claim to any part of Kathy's estate as surviving spouse with respect to the estate owned by Kathy prior to the time of their marriage or with respect to any property, real or personal acquired by her subsequent to said marriage. However, in no event shall Kathy be prevented from bequeathing property to Tom in her Last Will and Testament as she determines at her sole discretion.

4. Kathy hereby renounces and releases to Tom, his heirs and assigns, any and all right, title and interest or right of dower and courtesy [sic] to any property, both real and personal, of which Tom may now be seized [sic] or that he may hereafter acquire. Kathy further specifically renounces and releases to Tom's heirs-at-law, next of kin, legatees and devisees under his Last Will and Testament should Tom predecease her, any and all right, title, interest and right of dower and courtesy [sic] of which Kathy may have or be entitled, both real and personal. Kathy further agrees to make no claim to any part of Tom's estate as surviving spouse with respect to the estate owned by Tom prior to the time of their marriage or with respect to any property, real or personal, acquired by him subsequent to said marriage. However, in no event shall Tom be prevented from bequeathing property to Kathy in his last will and testament as he determines at his sole discretion.

The final paragraph of the agreement recited that the agreement was made in contemplation of their impending marriage, that it was entered into "freely, willingly and without duress" and further, that it was made for the purpose of insuring to each Tom and Kathy "that they will not claim any interest in the estate of the other upon his or her death, except as each may designate in his or her respective last will and testament."

The agreement was drawn by an attorney and mutual friend, who testified that it was duly executed February 21, 1975. The trial court found the agreement to have been executed freely, knowingly and voluntarily by both parties.

Although Tom and Kathy enjoyed a very high standard of living while they were married, the marriage was stormy. According to Kathy, she "very early on" knew there were problems. The parties separated several times, the first time in 1978. No children were born of the marriage.

Kathy was not employed outside the home after the marriage, although she had been a school teacher before she and Tom married. The Gentrys' income was derived chiefly from Tom Gentry Farms, a thoroughbred breeding enterprise of which Tom was the principal operator. Kathy does not claim to have been actively involved with the thoroughbred horses or with the day to day farm operations. The evidence indicated that her skills in decorating, advertising, and entertaining contributed to the success of the annual yearling sale. The trial court found, and Kathy conceded, however, that her efforts were far less significant than Tom's to the sales which funded the accumulation of property during the marriage.

While they were married, the parties maintained separate bank accounts. Virtually all assets acquired during the marriage were purchased with funds from Tom's farm account. All income from the enterprise apparently went into Tom's farm account, over which only Tom had signature authority. From that account, Kathy received a sum of money each month. In addition, the evidence showed she was frequently reimbursed for purchases and expenditures. At the time of the separation, Kathy had banking accounts in her own name, including an account with Merrill–Lynch, worth approximately $42,000.00.

Tom made several significant gifts and transfers of personal property, including jewelry, to Kathy during the marriage. He gave her a Steinway piano for her birthday. Frequently, jewelry and gifts were chosen by or delivered to Kathy shortly after the summer yearling sales, from which Tom Gentry Farms derived most of its annual income.

Kathy's name does not appear upon the documents evidencing title to any assets acquired during the marriage, with the exception of the bank accounts in her name and a parcel of real estate in California which was purchased in joint names during the marriage. Kathy apparently lived primarily in the California house during the last two years of the marriage.

A decree of divorce was entered July 1, 1986. After multiple hearings and a trial, the Fayette Circuit Court held that the

antenuptial agreement had been freely and voluntarily entered into by both Tom and Kathy, that each had made full disclosure to the other of their respective assets at the time the agreement was made, and that the intent of the parties was to provide for the disposition of all property in the event of termination of the marriage by either death or divorce. The circuit court further held that the agreement did not violate public policy and was not unconscionable.

The trial court found Tom's net worth to have declined significantly and to be between $650,000.00 and $750,000.00 as of the time Kathy filed for divorce, in January, 1986. The court found the parties had kept their property separate and awarded to Tom all property titled in his name and to Kathy all property titled in her name, except the California house, which, title notwithstanding, the court awarded to Tom as his separate property. Kathy was awarded all items of jewelry which had been given her, as well as the Steinway piano. Two silver pieces were found to be jointly owned and the court awarded one to each party. All other personalty was found to be separately owned. Most of it was awarded to Tom.

The circuit court awarded maintenance to Kathy in decreasing amounts over a seven year period. It also ordered Tom to pay the sum of $100,000.00 toward Kathy's attorneys fees to cross-respondents Natalie S. Wilson and Gess, Mattingly, Saunier and Atchison and, in addition, to reimburse Kathy for the costs of this action. At that time, costs exceeded $50,000.00.

Kathy appealed to the Kentucky Court of Appeals, which affirmed the trial court. She then filed a motion for discretionary review; Tom filed a cross motion as to the award of attorneys fees and costs. Both motions were granted.

We remand the Case to the Fayette Circuit Court with directions to award one-half the equity in the California house to Kathy Gentry. In all other respects, on both appeal and cross-appeal we affirm the result reached by the circuit court and the Court of Appeals.

## I. THE ANTENUPTIAL AGREEMENT BETWEEN TOM AND KATHY GENTRY WAS INTENDED TO CONTROL THE DISPOSITION OF ALL PROPERTY OF THE PARTIES UPON TERMINATION OF THE MARRIAGE, WHETHER BY DEATH OR BY DIVORCE.

The Court of Appeals held the Gentry antenuptial agreement was ambiguous. We disagree; but we conclude, as did the Court of Appeals, that the agreement is a valid and controlling contract for the disposition of all Tom and Kathy's property upon termination of their marriage by divorce.

The preamble of the agreement states that both parties desire that their marriage "shall not in any way change *their* legal property rights *or* the rights of their children or heirs at law to the property of each of them as they presently are before the marriage...." (emphasis added). The final paragraph states that the agreement is made for the purposes of insuring neither party will claim an interest in the estate of the other.

Tom argues that the preamble is clear and controlling and the concluding paragraph is nothing more than an effort to steer clear of the prohibition of *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522 (1916) against agreements "providing for, and looking to, future separation after marriage." Kathy cites the concluding paragraph of the agreement as evidence the parties intended the agreement to take effect only in the event of termination of the marriage by death. In the alternative, Kathy argues that the final paragraph, expressing a more limited purpose than the preamble, creates an ambiguity which must be resolved in Kathy's favor.

■ By the operative terms of the antenuptial agreement, Tom and Kathy renounced and released to each other, as well as to each other's heirs and assigns, any and all interest in property of which the other was then seized or which the other

might thereafter acquire.[1] In unambiguous terms, then, the parties agreed that upon termination of the marriage each would relinquish to the other, or the other's heirs, as the case might be, all rights in property which the other owned at the time of the marriage or which the other might own at dissolution of the marriage. In view of the clear and unambiguous provisions in the reciprocal renunciation and release, there is no need to address any arguable inconsistency in the preliminary and concluding purpose statements. They are not essential parts of the contract *City of Elizabethtown v. Cralle*, Ky., 317 S.W.2d 184 (1958); *Jones v. City of Paducah*, 283 Ky. 628, 142 S.W.2d 365 (1940); 17 Am. Jur.2d *Contracts* § 268, and serve only to aid construction if the contract is unclear. It is not. The operative provisions must therefore be given effect: Tom and Kathy each relinquished unto the other, in the event of their divorce, all property which the other owned at their marriage and which each might own at the termination of their marriage, regardless of any legal rights which might otherwise have accrued to either spouse as a result of the marriage.

## II. THE AGREEMENT DOES NOT VIOLATE PUBLIC POLICY.

Kathy argues that if the agreement was intended to apply in the event of divorce then it violates public policy as expressed in *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522 (1916) and is void. *Stratton* recognized that antenuptial property settlements intended to take effect on death are valid and even favored by law (see also *Lipski v. Lipski*, Ky., 510 S.W.2d 6 (1974); *Collins v. Bauman*, 125 Ky. 846, 102 S.W. 815 (1907); and *Forwood v. Forwood*, 86 Ky. 114, 5 S.W. 361 (1887), but held that any provisions of an antenuptial agreement "providing for, and looking to, future separation after marriage" were against public policy and void.

The *Stratton* court explained the policy underlying the rule in that case:

The rule so announced is but a manifestation of a long-settled policy of the law to the effect that it is beneficial to society that the marital relation should not be disturbed or its happiness marred, but that it should be upheld and encouraged, and that the parties to it should not be led into the breaking of its vows by the allurments (sic) of any stipulations which they may enter into before marriage. 170 Ky. 61, 185 S.W. 522, 525.

Most jurisdictions which have recently considered the question before us have recognized a change in public policy relative to divorce and have enforced antenuptial agreements in divorce situations. In *In re Marriage of Ingels*, 42 Colo.App. 245, 596 P.2d 1211 (1979), for example, the Colorado court rejected the notion that providing for the possibility of divorce necessarily promotes or encourages divorce:

Wife first argues that the antenuptial agreement is void as against public policy, because it is not limited to adjusting the parties' rights on death, and thus impermissibly "encourages" dissolution. We disagree.

. . . .

Courts have increasingly recognized that spouses-to-be have the right to enter into realistic antenuptial agreements which contemplate the possibility of dissolution, and have accordingly de-emphasized the traditional public policy argument that such agreements "promote" or "encourage" dissolution.... 596 P.2d 1211, 1213.

In *In re Marriage of Dawley*, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976), the California Court recognized that the possibility of dissolution is significant enough that the parties to a marriage might prudently consider it at the time the marriage is entered into:

---

**1.** We perceive no distinction between the terms "seised of" and "acquired" as used in the Gentry agreement. The intent was that Tom and Kathy would each be the owner of property to which he or she was vested with title or other indicia of ownership at termination of the marriage, without inquiry into the means by which the property was acquired and without regard to the statutory rights of spouses in marital property.

A man and woman entering into marriage may pledge their faith "till death do us part," but the unromantic statistics show that many marriages end in separation or dissolution. Spouses who enter into an antenuptial agreement cannot forecast the future; they must, as a realistic matter, take into account both the possibility of lifelong marriage and the possibility of dissolution. [131 Cal.Rptr. 3, 9] 551 P.2d 323, 329.

And in *Posner v. Posner*, Fla., 233 So.2d 381 (1970), the Florida court questioned the validity of the premise that divorce is to be discouraged in all circumstances:

We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists. And a tendency to recognize this change in public policy and to give effect to the antenuptial agreements of the parties relating to divorce is clearly discernible. 233 So.2d at 381, 384.

In Kentucky, subsequent cases have eroded the prohibition of *Stratton*. For example, in *Sousley v. Sousley*, Ky., 614 S.W.2d 942 (1981), this Court acknowledged doubts about the continued validity of the policy enunciated in *Stratton*. In *Jackson v. Jackson*, Ky., 626 S.W.2d 630 (1981), we distinguished *Stratton* and upheld the application of an antenuptial contract in a divorce situation because the obligation imposed by contract (that the husband would furnish the wife a "decent support" during his life) commenced on or before marriage, and had only an "incidental relationship" with a possible future dissolution.

Whatever public policy may have been in 1916, when *Stratton* was decided, we believe it must be reexamined in light of changes in society and the law since the opinion was written. The "unromantic statistics" show that many marriages in Kentucky end in divorce. The Stratton court, in 1916, wrote in the context of "fault based" divorce laws and a society in which divorce was uncommon, if not unthinkable.

It has been argued that, in KRS 403.-190(2)(d), the legislature intended to codify a public policy which approves of antenuptial contracts fixing the rights of the parties in the event of their divorce. A majority of this Court does not find that statute to be a clear statement of intent specifically to authorize such agreements. We do, however, believe that when the Kentucky General Assembly in 1972 enacted this and other portions of the Uniform Dissolution of Marriage Act, it was responding to significant changes in the expectations of parties to the marital contract and in the attitude of society toward divorce. In light of such changes, we believe the opinions of the Florida, Colorado and California courts, quoted above, more accurately reflect public policy toward divorce and antenuptial contracts today than does *Stratton*.

■ To the extent *Stratton* would preclude on public policy grounds a premarital contract between two competent parties, providing for the disposition of their property in the event of their divorce, *Stratton* is hereby overruled. We hold that a husband and wife in Kentucky may define by agreement their rights in each other's property, regardless of any rights which would otherwise have been excluded or conferred by KRS 403.190. Such agreements, provided they are otherwise valid contracts, are entitled to enforcement upon dissolution of the marriage.

■ The rule against antenuptial contracts which fix the parties' rights in the event of divorce also, of course, protects the public's interest in insuring that divorce does not leave one spouse destitute or dependent upon the state for support. In the Gentry antenuptial agreement, we are not confronted with a contract purporting to waive any claim to both marital property and maintenance, although we believe the trial court's broad discretion to review antenuptial agreements for unconscionability should adequately protect this interest.

The Gentry agreement, freely and voluntarily executed by the parties after full disclosure of their respective assets and marital property rights, and with the intent of providing for disposition of property in the event of divorce as well as in the event of death, does not violate public policy in

Kentucky. To the extent of any inconsistency with this holding, prior cases are overruled.

III. THE GENTRYS WAIVED, BY AGREEMENT, ANY CLAIM BY EACH OF THEM TO PROPERTY OWNED BY THE OTHER AT THE TERMINATION OF THE MARRIAGE, REGARDLESS OF HOW SUCH PROPERTY MIGHT OTHERWISE HAVE BEEN DISTRIBUTED OR DIVIDED UNDER KRS 403.190. EACH IS THEREFORE ENTITLED TO THE PROPERTY HELD IN HIS OR HER NAME AT THE TIME OF DIVORCE.

■ Kathy argued on appeal that even if the antenuptial agreement applies to the disposition of the Gentrys' premarital property in the event of their divorce, it could not affect the disposition of their "marital property." The Court of Appeals considered this argument and held as follows:

We do not disagree with this premise. The difficulty would seem to have been in determining precisely what their marital property was. The property which each acquired after the marriage and maintained as his or her separate property was not marital property by virtue of their agreement and KRS 403.190(2)(d).

The record substantiates the trial court's finding that Tom and Kathy, for the most part, maintained their premarital property separately and allocated to separate ownership the property acquired after the marriage. The effect of the agreement and the separate ownership of most assets was to obviate the necessity of the court's becoming involved in dividing property acquired during the marriage. By their agreement and their allocation of assets between them, the parties excluded such assets from the definition of "marital property" under KRS 403.190.

■ Kathy argues that even if the circuit court was correct in upholding the agreement, it nevertheless applied the agreement incorrectly as to one asset—the California house. All real estate except the California house was held solely in Tom's name and was awarded to Tom. Notwithstanding the fact that title was taken and held by Tom and Kathy jointly, the trial court found the California house was a business asset and awarded it to Tom. This was error. It is true the record establishes that the house was purchased from the Tom Gentry farm account, but just as Kathy may not argue that her contribution to the marriage and the enterprise is not accurately reflected in the ownership of assets, Tom is likewise precluded from arguing that the house is his sole and separate property. By virtue of the antenuptial agreement, property in Tom's name at the time of dissolution was Tom's; property in Kathy's name at the time of dissolution was Kathy's.

The Gentrys gave effect to their agreement by keeping their premarital property separate and by allocating between them property which would otherwise be subject to division by the court under KRS 403.190. In consideration of Kathy's reciprocal release, Tom renounced and released unto Kathy any property which she might own at the termination of the marriage. Having upheld the agreement, the court must give it effect. At the time of dissolution, Kathy had acquired, within the meaning of the agreement, and was seised of, a one-half undivided interest in the California real estate. We therefore remand to the trial court with instructions to award one-half the equity in the California real estate to Kathy Gentry, in accordance with the antenuptial agreement and the deed.

IV. THE RECORD DOES NOT REVEAL THE AGREEMENT TO BE UNCONSCIONABLE.

The trial court found the agreement was not unconscionable either at the time it was entered into or at the time it was enforced. Kathy argues this was error.

■ Although antenuptial agreements providing for the disposition of property on divorce are permitted, it is, of course, possible that a particular agreement may be invalid or even void when measured by appropriate standards:

... the trial judge should employ basically three criteria in determining whether to enforce such an agreement in a particular case: (1) Was the agreement obtained through fraud, duress or mistake, or through misrepresentation or non-disclosure of material facts? (2) Is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed so as to make its enforcement unfair and unreasonable? *Scherer v. Scherer*, [249 Ga. 635] 292 S.E.2d 662 (1982).

The Fayette Circuit Court found that the Gentry agreement was executed freely, knowingly and voluntarily. He rejected all claims of fraud, duress, mistake, misrepresentation and non-disclosure. There was no evidence which compelled a contrary finding.

■ The trial court also held the agreement was not unconscionable when it was executed. The contract applied equally to Tom and Kathy, although their respective financial conditions were disparate. The terms of the agreement were not manifestly unfair. It did not attempt to limit or deny maintenance or support. We find no reason to disturb the finding that the agreement was not unconscionable at the time of its execution.

■ The focus of Kathy's unconscionability argument on appeal is the third requirement set out in the *Scherer* opinion. Kathy argues, and we agree, that antenuptial agreements must be examined at the time enforcement is sought. An antenuptial agreement will not be enforced if facts and circumstances have changed so as to make its enforcement unconscionable. See also *Posner v. Posner*, Fla., 233 So.2d 381 (1970).

We note that the legislature, in KRS 403.180(2), has provided that property settlement agreements between divorce contestants will be reviewed by the court at the time of divorce in order to insure that the agreement is not unconscionable. In a property settlement agreement, the parties are dealing at arm's length in contemplation of imminent divorce and division of property. Parties entering into marriage, on the other hand, are not likely to exercise the same degree of vigilance in protecting their respective interests. Often there will be many years between the execution of an antenuptial agreement and the time of its enforcement. It is, therefore, appropriate that the court review such agreements at the time of termination of the marriage, whether by death or by divorce, to insure that facts and circumstances have not changed since the agreement was executed to such an extent as to render its enforcement unconscionable.

Examining the facts and circumstances in which the Gentry agreement was sought to be enforced, the Fayette Circuit Court held:

> today the time when the agreement is to apply, there is no evidence that this agreement is unconscionable. Clues as to what the evidence may be is not sufficient. Evidence should establish what exists at this time.

■ In deciding that enforcement of the Gentry agreement was not unconscionable, the circuit court properly considered the parties' respective financial conditions at the time of termination. It found Tom Gentry's financial condition had declined significantly during the marriage. The court also considered the extent to which each party contributed to the accumulation of property and rejected Kathy's claim that the allocation of property pursuant to the agreement was manifestly unfair in light of her efforts. Upon the record before us, we affirm the circuit court's finding that facts and circumstances at the time of dissolution had not changed so as to make enforcement of the Gentry agreement unconscionable as to Kathy Gentry.

## V. THE RECORD DOES NOT REVEAL THAT THE MAINTENANCE AWARDED WAS INADEQUATE IN AMOUNT OR DURATION.

Before awarding maintenance to either party to the dissolution, the trial court must find that the party:

(a) lacks sufficient property, including marital property apportioned to him, to

provide for his reasonable needs; and (b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home. KRS 403.200(1).

The Fayette Circuit Court determined that Kathy Gentry was entitled to maintenance under KRS 403.200(1). It awarded her maintenance in decreasing amounts over a period of seven years. Kathy argues that the award was insufficient in amount and duration. In setting the amount and duration of maintenance, the trial court must consider the factors set out in KRS 403.200(2):

. . . .

(2) the maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including:
(a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
(c) The standard of living established during the marriage;
(d) The duration of the marriage;
(e) The age, and the physical and emotional condition of the spouse seeking maintenance; and
(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

The record shows the Fayette Circuit Court considered all the statutory factors. It found Kathy Gentry had been awarded very little property, pursuant to the agreement, and that Tom's financial resources were also severely diminished. Further, although the parties had established a very high standard of living during the mar-

riage, neither Tom nor Kathy would be able to maintain that standard after dissolution. The court found Kathy was forty-six years old, in good physical and mental health, and, although unable presently to find appropriate employment, she would, with some training, be able to return to the job market. Until her return to work, the court found that Kathy would be able to support herself in a reasonable manner with the maintenance awarded.

 The trial court properly considered all factors and the record. Although the application of the statutory factors to the facts might support a larger award, the award of maintenance is left to the trial court's sound discretion. KRS 403.200(2). We cannot say the Fayette Circuit Court abused its discretion in fixing the amount and duration of maintenance, particularly in view of Tom's net worth and financial condition as that court found it. We therefore affirm the award of maintenance.

## VI. ATTORNEYS FEES AND COSTS

On cross-appeal, Tom Gentry argues it was error for the trial court to have awarded attorneys fees and costs to Kathy. His arguments are without merit. KRS 403.220 provides:

*403.220 Costs of Action and Attorney's Fees* The Court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

 In assessing costs, including attorneys' fees, against Tom, the trial court found disparity in the financial resources of Tom and Kathy. Under the statute, no more is required. KRS 403.220; *Bishir v. Bishir,* Ky., 698 S.W.2d 823 (1985). Clear-

ly the trial court had authority to award reasonable costs and attorney fees to Kathy. And although the amount awarded is extraordinary, in this case it is not unreasonable.

The circuit court found that a significant portion of the attorneys fees was incurred as a result of Tom Gentry's obstructive tactics and refusal to cooperate in the proceedings. The record amply supports the trial court's finding:

> ... the petitioner's attorney had to expend a great deal of time, just in preparation for the trial. They had to find out what the respondent's net worth was, what assets he owned, what liabilities were actually owed by him. And so, the first thing is the cost, and I don't have any problems with the costs in this case, because I feel that Mr. Gentry was an obstacle to the plaintiff's attorneys in trying to discover what his true financial picture was in this case, or what was his true financial picture. And they—they had to expend all this cost in time and effort just to overcome his resistance, and this is more than just a natural resistance. They had to bring his books up to date, and they had to prove whether or not certain assets were owned by him or someone else, and whether or not certain liabilities were, in fact, true liabilities. And, the record will bear all this out, that they did, in fact, do that. That he has attempted to conceal his assets, and overstate his liabilities. And they had to overcome this, and he's made it difficult. And so, the attorneys fees that are awarded in here are not really reflective of what would be the normal case, because this was not the normal case. Not simply because of the amount involved, because I've tried cases with a lot more involved than this, with a lot less cost and attorneys fees being incurred, because of not so much the cooperative of the parties involved, but the parties themselves not putting up obstacles because of additional work on the part of the attorneys in the case.

The amount of an award of attorney's fees is committed to the sound discretion of the trial court with good reason. That court is in the best position to observe conduct and tactics which waste the court's and attorneys' time and must be given wide latitude to sanction or discourage such conduct.

Tom argues that a great amount of the attorneys' fees were unnecessary. He claims that when the antenuptial agreement was upheld by the trial court, Kathy's subsequent efforts to discover Tom's net worth and identify his assets were superfluous to the proceedings. We disagree. The trial court was required to consider all Tom's assets and liabilities when it fixed the amount of maintenance. KRS 403.200(2)(f); see also *Budig v. Budig*, Ky., 481 S.W.2d 95 (1972). In addition, Tom's true net worth at the time of dissolution was material to the question of unconscionability or changed circumstances. The effort expended by Kathy's attorneys was appropriate to the issues in the case and to the difficulties encountered in uncovering the facts material to those issues.

We agree that many of the costs and fees were unnecessary in the sense that a good deal of the court's time and a substantial part of the costs and fees assessed could have been avoided by candor and cooperation. Under such circumstances, there is no abuse of discretion nor any inequity in requiring the party whose conduct caused the unnecessary expense to pay it. CR 37.01.

In *Bishir v. Bishir*, Ky., 698 S.W.2d 823 (1985), this court specifically held it was proper to award fees incurred by the wife in a post judgment CR 60.02 proceeding, even though, in that case, the wife's motion was overruled. The disparity of financial resources was sufficient grounds. In this instance, financial inequality justifies the award, KRS 403.220. Tom's obstructive tactics and conduct, which multiplied the record and the proceedings, justify both the fact and the amount of the award. KRS 403.220, CR 37.01.

Finally, Tom claims that the expert witness fees should not have been reimbursed to Kathy as costs because Kathy failed to

secure the approval of the trial court prior to employing the experts. He also claims that certain of the experts were biased against him.

▬▬▬▬ While this Court has held, in *Justice v. Justice*, Ky., 421 S.W.2d 868 (1967) that it is better practice for a party to secure the permission of the trial court prior to incurring expenses which will be claimed as costs, the failure to secure prior approval does not preclude recovery. There is no evidence that the appraisals and expert opinions were unnecessary and the record reveals no basis for Tom's argument that the experts' opinions were unreliable or their testimony inaccurate as a result of sympathy for Kathy or alleged antipathy toward Tom.

The amount of attorneys' fees and costs awarded in this case is extraordinary; however, the record is replete with evidence which supports the trial court's decision. The Fayette Circuit Court's order that Tom Gentry pay the costs of this action, including attorneys' fees of $100,000.00 to Kathy's attorneys, is affirmed.

STEPHENS, C.J., not sitting.

GANT and LAMBERT, JJ., concur.

COMBS, J., concurs by separate opinion.

LEIBSON, J., concurs by separate opinion in which JAMES G. SHEEHAN, Jr., Special Justice, joins.

VANCE, J., dissents by separate opinion in which WINTERSHEIMER, J., joins.

COMBS, Justice, concurring.

I believe that in enacting the divorce code, particularly KRS 403.110 and 403.180, the General Assembly intended to effect some change in Kentucky divorce law, and not merely to codify selected elements of the common law. To me, the legislation represents a conscious departure from the policy reflected in the decision of *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522 (1916).

The *Stratton* holding deplored antenuptial agreements contemplating the possibility of divorce and providing advance arrangements for alimony or maintenance. There was nothing, however, to prevent postnuptial agreements contingent on divorce and addressing not only the question of maintenance, but that of property distribution as well. I do not believe that KRS 403.180 was intended to leave the "antenuptial rule" of *Stratton* intact but uncodified, while making statutory the established "postnuptial rule."

KRS 403.110 mandates liberal construction and application of the chapter with the aim of promoting its underlying purposes, which are to:

(1) Strengthen and preserve the integrity of marriage and safeguard family relationships;

(2) Promote the amicable settlement of disputes that have arisen between parties to a marriage;

(3) Mitigate the potential harm to the spouses and their children caused by the process of legal distribution of marriage;

(4) Makes [sic] reasonable provision for spouse and minor children during and after litigation; and

(5) Make the law of legal dissolution of marriage effective for dealing with the realities of matrimonial experience by making irretrievable breakdown of the marriage relationship the sole basis for its dissolution.

KRS 403.110(1)–(5).

It is evident that the legislature considered the *modern* "realities of matrimonial experience," one of which is the real possibility of "no-fault" divorce. The integrity of marriage is no more eroded by a contingency agreement made on the eve of marriage than by one made after the ceremony. The ends of amicable settlement of disputes, mitigation of harm, and reasonable provision of maintenance may all be subserved by a prior agreement. Indeed, a clear mutual understanding with respect to these issues before marriage may well foster a strong, enduring relationship—by allaying suspicions as to matrimonial motivation, for example.

KRS 403.180, when read in light of KRS 403.110, requires enforcement of antenup-

tial property and maintenance agreements not unconscionable:

(1) To promote amicable settlement of *disputes* between parties to a marriage *attendant* upon their separation or the dissolution of their marriage, the parties may enter into a written separation agreement containing provisions for maintenance of either of them, disposition of any property owned by either of them, and custody, support and visitation of their children.

(2) In a proceeding for dissolution of marriage or for a legal separation, the terms of the separation agreement, except those providing for the custody, support and visitation of children, are binding upon the court unless it finds, after considering the economic circumstances of the parties, and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the separation agreement is unconscionable.

KRS 403.180(1)–(2). [Emphasis added.]

The "parties to a marriage" are the same parties prior to marriage; subsection (1) does not exclude agreements between persons contemplating marriage. Disputes attendant upon separation may well be settled more amicably, more expeditiously, and more fairly when they are addressed by a pre-existing agreement. The statute does not require that the agreement be one made *after* separation or dissolution.

In my view, the *Stratton* approach has been overruled by the General Assembly.

LEIBSON, Justice, concurring.

I concur in the Majority Opinion as written.

The Majority Opinion states on p. 934: "A majority of this Court does not find [KRS 403.190(2)(d) ] to be a clear statement of intent specifically to authorize such agreements."

I am part of the minority who believes this statute intends to authorize prenuptial agreements.

KRS 403.190(2) provides:

"For the purpose of this chapter, 'marital property' means all property acquired by either spouse subsequent to the marriage except:

(a) Property acquired by gift, bequest, devise, or descent;

(b) Property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(c) Property acquired by a spouse after a decree of legal separation;

(d) *Property excluded by valid agreement of the parties;* and

(e) The increase in value of property acquired before the marriage to the extent that such increase did not result from the efforts of the parties during marriage. [Emphasis added.]

Sub-paragraph (d) of the above statute, incorporated from the Uniform Dissolution of Marriage Act, has been accepted by courts of other jurisdictions as a statement of significant public policy change permitting antenuptial agreements to provide for the disposition of property upon dissolution of the marriage:

"Persons competent to contract may execute a valid antenuptial agreement. Although the law prescribes the rights of a husband and wife in the property of each other, persons may, by agreement, exclude the operation of the law and determine for themselves what rights they will have in each other's property during the marriage. (*Volid v. Volid*, (1972) 6 Ill.App.3d 386, 286 N.E.2d 42). In addition to property owned prior to the marriage, the parties may also define their rights to property acquired by a spouse later in the marriage." *In re Marriage of Burgess*, 123 Ill.App.3d 487, 78 Ill.Dec. 345, 462 N.E.2d 203 (1984).

By virtue of KRS 403.190(2)(d), a husband and wife in Kentucky may define by agreement their rights in each other's property, regardless of any rights which would otherwise have been excluded or conferred by KRS 403.190. Such agreements, provided they are otherwise valid contracts, are

entitled to enforcement upon dissolution of the marriage.

JAMES G. SHEEHAN, Jr., Special Justice, joins this concurring opinion.

VANCE, Justice, dissenting.

I dissent for the reasons expressed in my dissenting opinion in *Edwardson v. Edwardson,* Ky., 798 S.W.2d 941 (1990), rendered on this date. As I indicated therein, the long-established public policy of this state forbids enforcement of antenuptial agreements which look to future separation and divorce. This policy, if it is to be changed, should be changed by the General Assembly and not this court. The majority opinion recognizes that the General Assembly by enacting K.R.S. 403.190(2)(d) has not legislatively changed the long-established public policy which prohibits antenuptial agreements which look to the division of property in the event of a future divorce.

It expressed a belief, however, that the General Assembly was responding to significant changes in the expectations of the parties to the marital contract and in the attitude of society toward divorce, and therefore the opinions of Florida, California, and Colorado courts cited more accurately reflect public policy toward divorce and antenuptial contracts today than does *Stratton v. Wilson,* 170 Ky. 61, 185 S.W. 522 (1916).

The opinions of the courts in Florida, California, and Colorado reflect the public policy of those states, but they reflect the public policy of Kentucky not one bit. The public policy of this state is determined by the General Assembly and, in any given case, if the General Assembly has not declared a public policy, it is left to the court to do so. Once a public policy has been declared by the court, it should remain in effect until the legislature declares otherwise. Of course, the judiciary has the raw power to reverse public policy previously declared by it, but it should be reluctant to do so in cases of judicially declared policy which has become long-established precedent.

In any case, the majority opinion recognizes that K.R.S. 403.190(2)(d) does not overrule the public policy established by *Stratton v. Wilson, supra.* In my opinion, K.R.S. 403.190(2)(d) does not have the slightest bearing upon *Stratton v. Wilson.* It merely provides that marital property means all property acquired by either spouse subsequent to the marriage except,

"(d) property excluded by *valid* agreement of the parties."

The act is effective only as to conditions which existed at the time it was enacted and thereafter. It was not given retroactive effect. When K.R.S. 403.190(2)(d) was enacted, an antenuptial agreement looking forward to divorce or separation was not a *valid* agreement, and therefore subsection (d) would not apply to it.

Furthermore, subsection (d) of the act only applies to property and has no application at all to maintenance which is often the subject of antenuptial agreements.

I, therefore, believe that K.R.S. 403.-190(2)(d) has no application at all to antenuptial agreements which look toward divorce or separation and that it does not at all reflect any change in the public policy created by *Stratton v. Wilson, supra.*

WINTERSHEIMER, J., joins in this dissent.