James D. ATKISSON, Appellant,

v.

Kathleen M. ATKISSON, Appellee.

Nos. 2008–CA–000376–MR, 2008–CA–001774–MR.

Court of Appeals of Kentucky.

Nov. 13, 2009.

---

J. Andrew White, Louisville, KY, for appellant.

Delores Pregliasco, Louisville, KY, for appellee.

Before ACREE, STUMBO, and WINE, Judges.

## OPINION

WINE, Judge.

James Atkisson ("James") brings these consolidated appeals from a judgment and post-judgment orders of the Jefferson Family Court involving the dissolution of his marriage to Kathleen Atkisson ("Kathleen"). First, James appeals from the court's judgment restoring Kathleen's non-marital interest in the residence, dividing the parties' interest in a timeshare property, and awarding temporary maintenance and attorney fees to Kathleen. We find no reversible error in the trial court's rulings on these issues. In the second appeal, James contends that Kathleen filed premature garnishment writs against certain tax-deferred accounts, causing him to incur substantial penalties and taxes. We agree with the trial court that Kathleen was within her rights to file the garnishment writs when she did. However, we also find that the trial court abused its discretion by requiring James to be solely responsible for the early-withdrawal penalties and tax consequences caused by the garnishment. Hence, we affirm in part, reverse in part and remand with directions for the trial court to make appropriate adjustments in its allocation of the marital estate.

## Relevant Facts

James and Kathleen Atkisson were married on December 13, 1997. Both parties were previously married and no children were born of this marriage. They first separated in July of 2005. The parties briefly reconciled in May of 2006. However, the reconciliation was unsuccessful and the parties permanently separated in September of 2006.

James filed a petition for dissolution of the marriage on August 2, 2005, following the parties' first separation. The matter proceeded unabated during the attempted reconciliation. Following their final separation, Kathleen moved for temporary maintenance. In an order entered on February 7, 2007, the trial court ordered James to pay Kathleen temporary maintenance in the amount of $2,500.00 per month, which included provision for her health and car insurance. The court also ordered James to advance the amount of $10,000.00 for Kathleen's attorney fees.

The trial court conducted a bench trial on this matter on April 18, 2007, June 13, 2007, and October 10–11, 2007. The contested issues involved allocation of non-marital property, division of marital property, calculation of maintenance, and assignment of attorney fees. The trial court entered its findings of fact, conclusions of law, judgment and decree of dissolution on December 20, 2007. Both parties filed timely motions to alter, amend or vacate pursuant to Kentucky Rule(s) of Civil Procedure ("CR") 59.05. In an order entered on January 24, 2008, the trial court partially granted Kathleen's motion, increasing her share of the equity in the residence and addressing certain matters which were overlooked in the original judgment. The trial court denied the motions on the other issues.

James filed a timely notice of appeal from the trial court's judgment. Thereafter, on February 28, 2008, Kathleen filed non-wage garnishment against three of James's accounts and a judgment lien against his real property. James moved to quash the writs and lien, arguing that they were premature because the CR 59.05 motion suspended the dates for enforcement of the trial court's December 12, 2007 judgment. James also sought to recover damages which he incurred from the premature attachment of the accounts.

The trial court denied the motion to quash on August 19, 2008, concluding that Kathleen properly filed the garnishments. James filed a separate notice of appeal from this order. This Court ordered the two appeals consolidated on December 24, 2008.

### Issues on Appeal

In the first appeal, James takes issue with the trial court's division of the equity and debt in the marital residence, its division of the equity and debt in a marital timeshare, its award of temporary maintenance to Kathleen, and its award of attorney fees to Kathleen. In his second appeal, James contends that Kathleen prematurely filed the garnishment writs and judgment lien against his property.

### Division of Equity and Debt in Residence

■ James first argues that the trial court erred in its division of the equity and debt in the marital residence. The parties stipulated that the residence was worth $390,000.00. It was encumbered by a first mortgage of $296,000.00 and a home-equity-line with a balance of $45,000.00. In addition, the trial court found that Kathleen had made non-marital contributions to the marital residence totaling at least $140,000.00. However, the court concluded that James had failed to show that there was any marital contribution to the residence. At James's request, the trial court awarded the marital residence to him. Given the absence of any marital contribution, however, the trial court awarded all of the equity in the residence, $48,800.00, to Kathleen.

James maintains that this allocation was erroneous for several reasons. First, he contests the trial court's finding concerning Katherine's non-marital contribution to the residence. However, he does not challenge any of the evidence supporting this conclusion.

Rather, James primarily argues that the trial court erred in finding that there was no marital contribution to the residence. He contends that the trial court's finding overlooks his contributions to the payment of the mortgage and equity lines. He also argues that the trial court failed to account for Kathleen's withdrawal of $20,000.00 from the home-equity line in 2006. Given these marital contributions, James argues that the trial court should not have awarded the entire equity to Kathleen, but instead should have apportioned the equity in the marital residence as set out in *Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky.App.1981).

In *Brandenburg*, this Court set out a formula to apportion equity where the property was acquired with both marital and non-marital contributions. In essence, the formula requires the trial court to calculate the respective percentages of marital and non-marital contributions in relation to the total contribution to the property. Each percentage is then multiplied by the equity in the property to apportion the property between the parties. *Id.* at 872. While Kathleen documented her non-marital contribution to the residence, the trial court found no evidence to document a marital contribution to the

residence. In the absence of such documentation, the trial court concluded that it was impossible to apply the *Brandenburg* formula to apportion the equity in the property.

■ While we disagree with some of the trial court's reasoning, we conclude that the trial court did not err by declining to apply the *Brandenburg* formula. Kentucky Revised Statute ("KRS") 403.190(3) provides that all property acquired after the marriage and before a decree of legal separation is presumed to be marital property regardless of how the property is titled. As a result, all income earned by the parties during the marriage is marital property, except for income specifically excluded by statute. *See Dotson v. Dotson,* 864 S.W.2d 900, 902 (Ky.1993). In this case, the evidence establishes that the parties used marital funds to pay most of the mortgage payments.[1] Therefore, the value of the residence necessarily includes a marital interest to the extent that it exceeds Kathleen's non-marital contribution. *See Travis v. Travis,* 59 S.W.3d 904, 911–12 (Ky.2001).

However, *Brandenburg* defines "marital contribution" as "the amount expended after marriage from other than nonmarital funds *in the reduction of mortgage principal,* plus the value of all improvements made to the property after marriage from other than nonmarital funds." *Brandenburg, supra* at 872. (Emphasis added). James was unable to show the amount of marital funds which were used to reduce the original mortgage and line of credit. The determination of a marital contribution was further complicated after James re-financed the original mortgages and line-of-equity into the new first mortgage.

On the other hand, the trial court recognized a specific marital contribution of $21,000.00 in its January 25, 2008 order. In addition, Kathleen's withdrawal of the $20,000.00 from the line-of-equity account must be considered as an advance on her marital interest in the residence. But even if James is credited for these amounts, there is insufficient equity in the residence to fully reimburse Kathleen for her non-marital contribution. Thus, there is no marital equity to divide by the *Brandenburg* formula.

We recognize that the parties used some of the equity in the residence to finance marital expenses which were not related to the residence. These amounts reduce the remaining equity in the property, but do not affect the overall value of the residence. Furthermore, while James failed to document any additional reductions in the mortgage balances, the parties clearly made significant marital contributions to the payment of the mortgages. For these reasons, we agree with the trial court that Kathleen is not entitled to any additional marital property to compensate her for her non-marital contribution. However, the trial court properly awarded the entire $48,800.00 in equity to Kathleen as her non-marital property.

### Division of Equity and Debt in Timeshare

■ In 2004, the parties purchased two weeks of timeshare property from Fairfield Resorts for $18,287.00. Kathleen charged the down payment of $5,487.00 to her personal credit card, which was then paid in full through Diversified Financial and charged as income to James. James

---

1. The trial court also found that Kathleen took out a $30,000.00 home-equity line of credit in 2001, and she paid the majority of the loan, approximately $22,500.00, with non-marital assets. The court included the latter amount as part of Kathleen's non-marital contribution.

stipulated that Kathleen paid an additional $1,522.88 from non-marital sources. The balance of approximately $11,200.00 was placed on a BellSouth credit card, which was paid with a portion of a home equity loan against the marital residence. James has paid the annual fees and assessments on the timeshare with marital funds.

The trial court found that Kathleen had adequately traced $1,522.88 of her non-marital funds into the timeshare. The court ordered the timeshare to be sold. After payment of any costs associated with the sale, the court found that Kathleen is entitled to receive the first $1,522.88 from the proceeds. Any remaining proceeds shall be divided equally between the parties.

James argues that this division overlooks the debt which is associated with the timeshare property. The trial court assigned the entire mortgage debt (including the portion which is attributable to the timeshare) to James. James argues that this division effectively saddles him with the entire debt for the timeshare, while allowing Kathleen to receive her full interest in the timeshare free and clear from any debt.

But as Kathleen correctly notes, the marital debt on the timeshare is part of the current mortgage on the residence. The trial court deducted the full amount of both mortgages from the value of the residence to determine the equity in the property. Hence, the trial court properly accounted for the timeshare debt in its allocation of the equity.

### Award of Temporary Maintenance

James next challenges the trial court's award of temporary maintenance to Kathleen. A trial court may enter a temporary maintenance award to support a spouse while a dissolution action is pending. KRS 403.160. "The purpose of temporary maintenance is to preserve the status quo between the spouses while the dissolution proceeding is pending." *Horvath v. Horvath*, 250 S.W.3d 316, 318 (Ky. 2008). Such orders are interlocutory in nature and generally are not subject to appeal. *See Cannon v. Cannon*, 434 S.W.2d 48 (Ky.1968); and *Lebus v. Lebus*, 382 S.W.2d 873 (Ky.1964).

However, James maintains that the temporary award was excessive and therefore he was entitled to a credit for the overpayment in the final judgment. He contends that Kathleen willfully remained unemployed during the pendency of the action. He also points to her withdrawal of over $20,000.00 from the home equity line of credit. James argues that any additional temporary maintenance was inappropriate. Consequently, he requests that his temporary maintenance payments be credited against Kathleen's award of marital property.

In disposing of this argument, the trial court noted that it had previously imputed full-time income to Kathleen when determining and calculating the temporary maintenance award. Like the trial court, we are not persuaded that the temporary maintenance award was excessive or that James is entitled to credit his maintenance payments towards Kathleen's share of the marital estate. Therefore, we find no basis to disturb the trial court's judgment.

### Attorney Fees

In the last issue raised in his first appeal, James contends that the trial court abused its discretion by awarding attorney fees to Kathleen. While the matter was pending, the trial court ordered James to advance $10,000.00 for Kathleen's attorney fees. The court awarded this amount to Kathleen in its final judgment, but denied her request for additional attorney fees.

James argues that Kathleen was not entitled to any award given the amount of marital and non-marital assets which she received in the judgment.

■ KRS 403.220 authorizes a trial court to order one party to a divorce action to pay a "reasonable amount" for the attorney fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor. But even if a disparity exists, the trial court retains broad discretion under KRS 403.220 to determine the appropriate amount of attorney fees. *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 519 (Ky. 2001); *see also Gentry v. Gentry*, 798 S.W.2d 928, 938 (Ky.1990). The trial court awarded Kathleen a substantial amount of liquid marital property. Nevertheless, James retains a substantially higher earning capacity. In addition, he received the residence and most of the income-producing property. We also note that the trial court awarded Kathleen only about half of her claimed attorney fees. Under the circumstances, we cannot find that the trial court's award of attorney fees amounted to an abuse of its discretion.

### Filing of Garnishment Writs and Judgment Lien

■ In his second appeal, James contends that Kathleen filed the writs of garnishment and judgment lien before the compliance dates in the trial court's judgment had passed. As a result of this premature filing, James states that he incurred substantial penalties and interest as a result of the garnishment against his Allstate pension account. James maintains that these expenses should come out of Kathleen's share of the marital property since they were incurred as a result of her actions.

The first issue in this appeal concerns the effect of CR 59.05 and 62.01 on the compliance dates set out in the trial court's judgment. In its December 20, 2007 order, the trial court set out three specific dates for James to transfer certain assets to Kathleen: (1) James was to transfer the account ending in 4026 to Kathleen within 15 days from entry of the order (on or before January 4, 2008); (2) James was to pay Kathleen $12,138 from the account ending in 2861 and an offset amount of $42,274.47 for her portion of marital assets, for a total of $54,412.47, within 60 days (on or before February 18, 2008); and (3) James was to pay Kathleen $28,000.00 for her interest in the marital residence within 60 days (on or before February 18, 2008).

The parties agree that the CR 59.05 motions stayed enforcement of the judgment while the motions were pending. CR 61.02. James, however, argues that the motions re-set the appropriate dates of compliance for him to make certain payments to Kathleen under the judgment. Specifically, he contends that those times frames for performance began to run as of January 25, 2008, when the trial court ruled on the CR 59.05 motions. The trial court disagreed, holding that the compliance periods set out in the December 20, 2007 order remained applicable except where specifically modified by the January 25, 2008 order. Thus, the trial court concluded that Kathleen's garnishment writs, filed on February 28, 2008, were not premature.

The parties and the trial court focused on whether the December 20, 2007 judgment was a final order. This analysis seems to be more confusing than helpful. Indeed, the term "finality," like the term "jurisdiction," has different meanings depending on the context. Under CR 54.01, a "final or appealable judgment is a final order adjudicating all the rights of all the parties in an action or proceeding, or a

judgment made final under Rule 54.02". In this sense, the December 20, 2007 order was a final judgment.

■ But under CR 59.04 and 59.05, the trial court has control over its judgment with a right to order a new trial, or alter, amend or vacate the judgment, either on motion or *sua sponte,* for ten days after entry of judgment. Upon the filing of a timely CR 59.05 motion, a "final judgment" is converted into an interlocutory judgment until the motion is adjudicated. *Johnson v. Smith,* 885 S.W.2d 944, 947 (Ky.1994). Likewise, a timely CR 59.05 motion operates "to stay the execution of or any proceedings to enforce a judgment pending the disposition of any such motion . . ." CR 62.01.

■ As a result, James makes a plausible argument that the judgment did not become final and enforceable until January 25, 2008. However, in *Hocker v. Fisher,* 590 S.W.2d 342 (Ky.App.1979), this Court explained that CR 62.01 operates to suspend the judgment prospectively from the time the motion is timely filed until it is overruled. *Id.* at 344. The denial of the motion confirms the finality and enforceability of the original judgment. *Harris v. Stephenson,* 321 S.W.2d 399, 401 (Ky. 1959).

■ For purposes of determining the time for filing an appeal, "finality" runs from the date on which the court denies the motion. *Gullion v. Gullion,* 163 S.W.3d 888, 891 (Ky.2005) (*citing Kurtsinger v. Board of Trustees of Kentucky Retirement Systems,* 90 S.W.3d 454, 458 (Ky.2002)). Once a judgment is entered, it is final and binding until modified, and any payments which may have become due before such modification constitute a fixed and liquidated debt. *Whitby v. Whitby,* 306 Ky. 355, 208 S.W.2d 68, 69 (1948), *overruled on other grounds by Knight v.*

*Knight,* 341 S.W.2d 59 (Ky.1960). Thus, interest, for example, accrues on the judgment from the date of its entry notwithstanding the filing of an unsuccessful CR 59.05 motion.

In this case, however, the question concerns the effect of CR 59.05 and 62.01 on the compliance dates set out in the original judgment. The trial court did not address the first two compliance dates in its January 25, 2008 order. But with respect to the third date, the court directed James to pay Kathleen $48,000.00 for her interest in the marital residence on or before February 25, 2008. The court also ordered James to submit a Qualified Domestic Relations Order ("QDRO") by February 25, 2008, to divide his pension.

Curiously, we find no authority addressing what happens when compliance periods set out in a judgment are stayed by operation of CR 62.01. But given the other authority discussed above, we cannot agree with James that the compliance periods set out in the original judgment automatically re-commence upon entry of the order denying the CR 59.05 motion. The trial court's judgment remains in effect until modified, although enforcement of the judgment is stayed by operation of CR 62.01. In situations where the compliance dates have already passed when the trial court denies a CR 59.05 motion, the trial court should allow a reasonable amount of time for the judgment obligor to comply with the trial court's orders. Ideally, the court's order would set out the new compliance period. In the absence of such an order, the new compliance period is within the trial court's reasonable discretion.

Here, the trial court's first compliance date of January 4, 2008, had passed before the trial court ruled on the CR 59.05 motions. Even assuming that the 15–day period began to run again as of January 25, 2008, that period would have lapsed

again before Kathleen filed her garnishment writs on February 28. Thus, we agree with the trial court that the garnishment writs with respect to this obligation were not premature.

The situation involving the second and third compliance dates is more complicated, but the same principle applies. Under the original order, James had until February 18 to pay the $54,412.47 to Kathleen. Under the amended order, James had until February 25 to pay the $48,800.00 to Kathleen. While the second period was stayed while the CR 59.05 motions were pending, James still had 24 days remaining to make the second payment and 30 days to make the third payment. We cannot say that these time periods were unreasonable. Furthermore, if James had legitimate problems complying with these deadlines, he should have brought the matter to the trial court's attention and sought an extension of time. Since he did not do so, Kathleen did not prematurely file the garnishment writs and judgment lien.

■■■■■■ But while Kathleen was within her rights to file the writs, we question the trial court's decision to allow Kathleen to garnish the tax-deferred accounts. Because the trial court allowed the garnishment against these accounts, James states that he incurred 10% penalties for early withdrawal, plus additional taxes and fees. James contends that these penalties should be assessed against Kathleen's share of the marital estate.

■■■■ In the absence of a statutory exemption, tax-deferred accounts are subject to garnishment and judgment liens like any other account. However, the trial court should consider the tax consequences of its division of marital property. *See Broida v.* *Broida,* 388 S.W.2d 617, 621 (Ky.1965); and *Owens v. Owens,* 672 S.W.2d 67, 69 (Ky.App.1984). Otherwise, the payor spouse's share of the marital estate might be consumed by the taxes incurred to liquidate sufficient assets for the payee spouse's share.

In this case, the trial court recognized that James would incur substantial penalties and taxes by allowing the garnishments; but the court concluded that James could have avoided these consequences by paying the judgments within the time frames provided in the judgments. Under the specific circumstances of this case, we disagree.

The trial court faulted James for his failure to submit a QDRO by the February 25 deadline set out in the amended judgment. Although James failed to meet this deadline, it is clear from the record that James and his counsel made a good faith effort to do so. James submitted a QDRO to Kathleen's counsel, who responded that a QDRO would not be necessary.

We agree with the trial court that James's submission of the QDRO to the Kathleen's counsel did not comply with the mandate set out in the judgment. However, the trial court made no effort to determine whether James had other accounts which could be garnished without incurring such drastic tax consequences. Furthermore, the trial court could have imposed additional attorney fees and costs for the delay. Additionally, of course, the amounts bear interest at the post-judgment rate from December 20, 2007.

By upholding the garnishment writs against the tax-deferred accounts, the trial court subjected James to a penalty which was far in excess of his breach.[2] The

---

2. In his brief, James estimates that the penalties and taxes caused by the garnishment will amount to nearly $15,000.00.

garnishment writ converts a deferred distribution of marital assets into a present-value distribution. The penalties and taxes imposed on James fundamentally alter the underlying allocation of marital assets. Consequently, we find that the trial court's decision to uphold the writs amounted to an abuse of its discretion.

Since the trial court upheld the garnishment writs, James has presumably already incurred the penalties and taxes as a result of the early withdrawals. We agree with James that these additional expenses should be assessed, at least in part, against Kathleen's portion of the marital estate. However, we also agree with the trial court that James bears some, if not substantial, responsibility for these penalties since he did not fully comply with the trial court's orders. Therefore, we will remand this matter to the trial court for a determination of the amount of penalties and taxes incurred as a result of the garnishment and an appropriate allocation of this amount between the parties.

Accordingly, the judgment of the Jefferson Family Court is affirmed in part, reversed in part, and remanded for additional proceedings as set forth in this opinion.

ALL CONCUR.