233 So.2d 381 (1970)
Victor POSNER, Petitioner,
v.
Sari POSNER, Respondent.
No. 37162.
Supreme Court of Florida.
March 25, 1970.
*382 Frates, Fay, Floyd & Pearson, Ray H. Pearson and Guy B. Bailey, Jr., Miami, for petitioner.
Broad & Cassel and Sibley, Giblin, Levenson & Ward, Marion E. Sibley and Irving B. Levenson, Miami Beach, for respondent.
ROBERTS, Justice.
This cause is before the court on rehearing granted on petition for certiorari to review the decision of the Third District Court of Appeal in Posner v. Posner, Fla.App. 1968, 206 So.2d 416. Both parties had appealed to the appellate court for reversal of the decree of the Chancellor entered in a divorce suit  the wife having appealed from those portions of the decree awarding a divorce to the husband and the sum of $600 per month as alimony to the wife pursuant to the terms of an antenuptial agreement between the parties, and the husband having attacked, by cross-appeal, the award of $600 per month support money for each of the two minor children of the parties.
The three appellate judges who considered the appeals agreed upon the affirmance of the decree of divorce to the husband and the award for child support of $1,200 per month. However, each took a different position respecting the antenuptial agreement concerning alimony. Their respective views were (1) that the parties may validly agree upon alimony in an antenuptial agreement but that the trial court is not bound by their agreement; (2) that such an agreement is void as against public policy; and (3) that an antenuptial agreement respecting alimony is entitled to the same consideration and should be just as binding as an antenuptial agreement settling the property rights of the wife in her husband's estate upon his death. They have certified to this court, as one of great public interest, the question of the validity and binding effect of an antenuptial agreement respecting alimony in the event of the divorce or separation of the parties. We have concluded that jurisdiction should be accepted, as authorized by Section 4(2), Article V, Florida Constitution, F.S.A.
At the outset we must recognize that there is a vast difference between a contract made in the market place and one relating to the institution of marriage.
It has long been the rule in a majority of the courts of this country and in this State that contracts intended to facilitate or promote the procurement of a divorce will be declared illegal as contrary to public policy. See Gallemore v. Gallemore, 1927, 94 Fla. 516, 114 So. 371; Allen v. Allen, 1933, 111 Fla. 733, 150 So. 237. The reason for the rule lies in the nature of the marriage contract and the interest of the State therein.
At common law, the so-called "matrimonial causes", including divorce, were cognizable only in the Ecclesiastical Courts. Because of the Church's view of the sanctity of the nuptial tie, a marriage valid in its inception would not be dissolved by an absolute divorce a vinculo matrimonii, even for adultery  although such divorces could be granted by an Act of Parliament. Therefore, the divorce was only from bed and board, with an appropriate allowance for sustenance of the wife out of the husband's estate. See Ponder v. Graham, 1851, 4 Fla. 23; Chitty's Blackstone, Vol. I, Ch. XV, 432, 441. We have, of course, changed by statute the common-law rule respecting the indissolubility of a marriage valid in its inception; but the concept of marriage as a social institution that is the foundation of the family and of society remains unchanged. See 38 Am.Jur., Marriage, Sec. 8, p. 185. *383 Since marriage is of vital interest to society and the state, it has frequently been said that in every divorce suit the state is a third party whose interests take precedence over the private interests of the spouses. See Underwood v. Underwood, 1868, 12 Fla. 434; Light v. Meginniss, 1945, 156 Fla. 61, 22 So.2d 455; Pickston v. Dougherty, Fla.App. 1959, 109 So.2d 577; Wall v. Wall, Fla.App. 1961, 134 So.2d 288.
The state's interest in the preservation of the marriage is the basis for the rule that a divorce cannot be awarded by consent of the parties, see Underwood v. Underwood, supra, 12 Fla. 434, as well as the doctrine of corroboration applicable in divorce suits, see Pickston v. Dougherty, Fla.App. 1959, 109 So.2d 577. In the Underwood case this court said that it "would be aiming a deadly blow at public morals to decree a dissolution of the marriage contract merely because the parties requested it;" and in the Pickston case it was noted that the "prime object of the corroboration doctrine is to prevent collusion and to forestall any attempt which might otherwise be made to destroy the marital relationship falsely."
And it is this same public policy that is the basis for the rule that an antenuptial agreement by which a prospective wife waives or limits her right to alimony or to the property of her husband in the event of a divorce or separation, regardless of who is at fault, has been in some states held to be invalid. See the cases collected in the annotation in 57 A.L.R.2d 942 et seq.; 27 Am.Jur., Husband and Wife, Sec. 275, p. 881, and Sec. 326, p. 923; Werlein v. Werlein, 1965, 27 Wis.2d 237, 133 N.W.2d 820; Crouch v. Crouch, 1964, 53 Tenn. App. 594, 385 S.W.2d 288; Motley v. Motley, 1961, 255 N.C. 190, 120 S.E.2d 422. The reason that such an agreement is said to "facilitate or promote the procurement of a divorce" was stated in Crouch v. Crouch, supra, as follows: 
"Such contract could induce a mercenary husband to inflict on his wife any wrong he might desire with the knowledge his pecuniary liability would be limited. In other words, a husband could through abuse and ill treatment of his wife force her to bring an action for divorce and thereby buy a divorce for a small fee less than he would otherwise have to pay."
Antenuptial or so-called "marriage settlement" contracts by which the parties agree upon and fix the property rights which either spouse will have in the estate of the other upon his or her death have, however, long been recognized as being conducive to marital tranquility and thus in harmony with public policy. See Del Vecchio v. Del Vecchio, Fla. 1962, 143 So.2d 17, in which we prescribed the rules by which the validity of such antenuptial or postnuptial property settlement agreements should be tested. Such an agreement has been upheld after the death of the spouse even though it contained also a provision settling their property rights in the event of divorce or separation  the court concluding that it could not be said this provision "facilitated or tended to induce a separation or divorce." See In re Muxlow's Estate, 1962, 367 Mich. 133, 116 N.W.2d 43.
In this view of an antenuptial agreement that settles the right of the parties in the event of divorce as well as upon death, it is not inconceivable that a dissatisfied wife  secure in the knowledge that the provisions for alimony contained in the antenuptial agreement could not be enforced against her, but that she would be bound by the provisions limiting or waiving her property rights in the estate of her husband  might provoke her husband into divorcing her in order to collect a large alimony check every month, or a lump-sum award (since, in this State, a wife is entitled to alimony, if needed, even though the divorce is awarded to the husband) rather than take her chances on being remembered generously in her husband's will. In this situation, a valid antenuptial agreement limiting property rights upon death would have the same meretricious effect, insofar as the public policy in *384 question is concerned, as would an antenuptial divorce provision in the circumstances hypothesized in Crouch v. Crouch, supra, 385 S.W.2d 288.
There can be no doubt that the institution of marriage is the foundation of the familial and social structure of our Nation and, as such, continues to be of vital interest to the State; but we cannot blind ourselves to the fact that the concept of the "sanctity" of a marriage  as being practically indissoluble, once entered into  held by our ancestors only a few generations ago, has been greatly eroded in the last several decades. This court can take judicial notice of the fact that the ratio of marriages to divorces has reached a disturbing rate in many states; and that a new concept of divorce  in which there is no "guilty" party  is being advocated by many groups and has been adopted by the State of California in a recent revision of its divorce laws providing for dissolution of a marriage upon pleading and proof of "irreconcilable differences" between the parties, without assessing the fault for the failure of the marriage against either party.
With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also  and agree upon, if possible  the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail. In Allen v. Allen, supra, 150 So. at page 238, this court said that the agreements relating to divorce that are held to be illegal as contrary to public policy are those "withdrawing opposition to the divorce or not to contest it or to conceal the true cause thereof by alleging another" and that they "have no reference to bona fide agreements relating to alimony or the adjustment of property rights between husband and wife, though in contemplation of divorce, if they are not directly conducive to the procurement of it."
We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists. And a tendency to recognize this change in public policy and to give effect to the antenuptial agreements of the parties relating to divorce is clearly discernible. Thus, in Hudson v. Hudson, Okl. 1960, 350 P.2d 596, the court simply applied to an antenuptial contract respecting alimony the rule applicable to antenuptial contracts settling property rights upon the death of a spouse and thus tacitly, if not expressly, discarded the contrary-to-public-policy rule.
Sanders v. Sanders, 1955, 40 Tenn. App. 20, 288 S.W.2d 473, involved an antenuptial contract providing that the parties would poll their separate properties and make future acquisitions in their joint names, and that the party filing a suit for divorce would forfeit his or her interest in the properties. The court construed the provision for forfeiture as applicable only in the event that a divorce suit was not filed in good faith and held that, as so construed, the contract was not promotive of divorce and was valid.
In LeFevers v. LeFevers, 1966, 240 Ark. 992, 403 S.W.2d 65, the validity of an antenuptial agreement providing that, in the event of divorce, the wife should be restored to her own property rights and have one-half of the net gain made by the joint efforts of the parties during marriage, was not questioned  the contest being only as to the proper interpretation of the contract.
In re Muxlow's Estate, 1962, 367 Mich. 133, 116 N.W.2d 43, was a contest between the heirs of the deceased spouses, in which the heirs of the deceased husband relied upon an antenuptial agreement limiting the husband's financial obligations to the wife in the event of divorce and the share of his estate to which she would be entitled *385 at his death. The agreement was upheld, the court stating that it could not be held that any effective provision in the agreement "provided for, facilitated, or tended to induce a separation or divorce * * *."
Strandberg v. Strandberg, 1967, 33 Wis.2d 204, 147 N.W.2d 349, was a divorce case in which an antenuptial agreement providing for the division of property in the event of divorce or separation was held to be void; however, it was held, also, that it could be admitted into evidence "and considered for a limited purpose as one of the circumstances in determining the equities of the division."
The trend of recent cases involving post-nuptial agreements is well summarized by the court in Schulz v. Fox, 1959, 136 Mont. 152, 345 P.2d 1045, 1050, as follows: 
"The conclusion to be drawn from these cases is that any agreement the purpose of which is to facilitate the granting of a divorce without proper grounds existing, is void, but that where proper grounds do exist, an agreement with respect to a property settlement, when not brought about by duress or coercion, cannot be said to perpetrate a fraud upon the court and will not be held void. * * * All of the well reasoned cases we have read look to the collusive intent, that is, as to whether the divorce was on proper grounds and as to whether the Court's interest in the continuity of the marriage status or support of spouse and children has been protected."
We have given careful consideration to the question of whether the change in public policy towards divorce requires a change in the rule respecting antenuptial agreements settling alimony and property rights of the parties upon divorce and have concluded that such agreements should no longer be held to be void ab initio as "contrary to public policy." If such an agreement is valid when tested by the stringent rules prescribed in Del Vecchio v. Del Vecchio, supra, 143 So.2d 17, for ante- and post-nuptial agreements settling the property rights of the spouses in the estate of the other upon death, and if, in addition, it is made to appear that the divorce was prosecuted in good faith, on proper grounds, so that, under the rules applicable to postnuptial alimony and property settlement agreements referred to above, it could not be said to facilitate or promote the procurement of a divorce, then it should be held valid as to conditions existing at the time the agreement was made.
The question of the future binding effect of such antenuptial agreements when presented to the Chancellor for approval and incorporation in the final decree, and the question of the modification thereof upon a showing of a change in circumstances after the entry of the decree of divorce, should be decided under applicable statutory law and judicial decisions relating to postnuptial contracts settling the alimony and/or property rights of the parties.
Section 61.14, Florida Statutes, F.S.A. (Ch. 16780, 1935) among other things, provides: 
"(1) When a husband and wife have entered or hereafter enter into an agreement for payments for, or instead of, support, maintenance or alimony, whether in connection with an action for divorce or separate maintenance or with any voluntary property settlement or when a husband is required by court order to make any payments to his wife, and the circumstances of the parties or the financial ability of the husband has changed since the execution of such agreement or the rendition of the order, either party may apply to the circuit court of the circuit in which the parties, or either of them, resided at the date of the execution of the agreement or reside at the date of the application or in which the agreement was executed or in which the order was rendered, for a judgment decreasing or increasing the amount of support, maintenance or alimony, *386 and the court has jurisdiction to make orders as equity requires with due regard to the changed circumstances and the financial ability of the husband, decreasing or increasing or confirming the amount of separate support, maintenance or alimony provided for in the agreement or order."
We must assume that the parties to this litigation knew of the existence of § 61.14, Florida Statutes, F.S.A., when they made their agreement in 1960 and that their capacity to make the agreement was and is limited by same.
In summary, we hold that the antenuptial agreement, if entered into under the conditions outlined in Del Vecchio v. Del Vecchio, supra, 143 So.2d 17, was a valid and binding agreement between the parties at the time and under the conditions it was made, but subject to be increased or decreased under changed conditions as provided in § 61.14, Florida Statutes, F.S.A.
Accordingly, the decision under review is quashed with instructions to the District Court of Appeal, Third District, to vacate that portion of the final decree of the trial court relating to alimony and support money and remand same for further proceedings in the trial court not inconsistent with this opinion.
It is so ordered.
ERVIN, C.J., and DREW, THORNAL, CARLTON, and ADKINS, JJ., concur.
SPECTOR, District Court Judge, concurs specially with opinion.
SPECTOR, District Court Judge (concurring specially):
On rehearing granted I adhere to all that was stated in this court's original opinion filed April 9, 1969, in support of the holding that antenuptial agreements which meet the tests enumerated in Del Vecchio v. Del Vecchio, Fla., 143 So.2d 17, are valid and are not void as being contrary to the public policy of this State.
Nonetheless, I agree with Justice Roberts' view as expressed in his opinion on rehearing that an amount of alimony stipulated for in a valid antenuptial agreement may be subject to modification under the provisions of Section 61.14, Florida Statutes, F.S.A., formerly Section 65.15, Florida Statutes, upon a showing that the wife's circumstances have so changed since the amount agreed upon was incorporated in a divorce decree that it would be inequitable to limit her to the agreed amount of alimony in the face of such changed circumstances which require an increase in alimony to maintain a standard of comfort which the agreed amount would have afforded. Doubtless there are cases wherein prospective marital partners have entered into valid antenuptial agreements which provide a mutually satisfactory sum of alimony in the event of divorce and thereafter the wife becomes afflicted with ill health and its attendant high medical expenses. By reason of such extraordinary and unanticipated expenses, the amount provided in the agreement might amount to no alimony at all and the unfortunate lady might thereupon become a public charge and have to go on the draw. I think such a contingency was among the evils intended to be avoided by the legislature when it enacted Section 61.14, Florida Statutes, F.S.A. See State ex rel. Willard v. Harrison, 133 Fla. 169, 183 So. 464 (1937), in which the court was considering Chapter 16780, Acts of 1935, now Section 61.14, Florida Statutes, F.S.A., and speaking to the intent and purpose of the cited law quoted with approval the following:
"Alimony may be changed on grounds connected with the support of children, or may be increased where it becomes inadequate, as where the wife becomes helpless and needs more than before. Alimony may be reduced where the husband's income is decreased, as where the illness of the husband has caused him *387 large expense and the wife needs less than before, or where the wife inherits property sufficient for her needs." 183 So. p. 467
That law was enacted in the middle of a great depression. Hard times fell upon many who in an earlier era could afford more generous financial arrangements. Some were agreed to mutually between the spouses while others were ordered by the court in divorce litigation where mutual agreement was not forthcoming. As hard times took its toll, the husbands could no longer meet their alimony obligations and relief from such burdens became necessary. Such relief also was contemplated by Section 61.14, Florida Statutes, F.S.A.
A review of the cases which have considered the court's statutory power to modify agreed or awarded alimony makes it clear that such power should be exercised only in the face of the strongest and most compelling reasons. See for example Ohmes v. Ohmes, 200 So.2d 849 (Fla.App. 1967), and cases cited therein. Mere ability on the part of the husband to pay more than the amount awarded or agreed upon is not a proper basis for relief under the subject statute. The husband's ability is to be considered only after the wife has convincingly demonstrated an increased need on her part because of her changed circumstances. Only upon the making of such a showing can the court inquire into his ability to pay more.
The question of alimony in the case sub judice is one which was agreed upon by the parties prior to marriage in an agreement which we here hold to be valid in view of the Del Vecchio case, supra. In arriving at that conclusion, the court is unconcerned with whether the husband was initially able to pay more alimony than the amount agreed to in the antenuptial agreement since the very purpose of such an agreement is to provide a mutually satisfactory substitute for such determination of ability. If events have since transpired which have changed the wife's circumstances so as to warrant invoking the relief provided by Section 61.14, Florida Statutes, F.S.A., the trial court is empowered to grant such relief. We are not unmindful that the nation is experiencing an inflationary trend or condition, and this circumstance too may well be the basis of a finding by the chancellor that circumstances have so changed as to require equitable adjustment under the subject statute.
Accordingly, I concur in the judgment upholding the validity of the antenuptial agreement and remanding the case for further consideration by the trial court of the question of relief under Section 61.14, Florida Statutes, F.S.A., in accordance with the above in the event respondent elects to proceed under said statute by filing appropriate supplemental pleadings. See Norton v. Norton, 131 Fla. 219, 179 So. 414 (1938); Mouyois v. Mouyois, 97 So.2d 718 (Fla.App. 1957).
ERVIN, C.J., and DREW, J., concur.