IN THE SUPREME COURT OF TENNESSEE

AT JACKSON

**FOR PUBLICATION**

CHARLES M.  CARY, Jr. )
)
Plaintiff-Appellant. )
)
Vs. )
)
)
CATHY ANN CARY, )
)
Defendant-Appellee. )

**Filed:    June 3, 1996**

HARDEMAN CIRCUIT

HON. C. CREED McGINLEY,
JUDGE

No.  02-S-01-9505-CV-00035

**FILED**

**June 3, 1996**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

**For Appellant:**

Terry Abernathy
Selmer, Tennessee

**For Appellee:**

Cathy Ann Cary, Pro Se
284 North High
Bells, Tennessee  38006

# O P I N I O N

AFFIRMED IN PART;
REVERSED IN PART;
TRIAL COURT JUDGMENT REINSTATED.                    ANDERSON, C.J.

We granted this appeal to determine whether a provision in an antenuptial agreement by which a prospective spouse waives alimony is void because it violates public policy. The trial court held that such a provision in an antenuptial agreement, which waived alimony, was valid and enforceable and, therefore, denied the spouse's application for alimony. The Court of Appeals, however, reversed, holding that the waiver of alimony provision was void as against public policy, and remanded to the trial court to consider whether to award alimony.

We have determined that a voluntary and knowing waiver or limitation of alimony in an antenuptial agreement is not void and unenforceable as contrary to public policy. Such provisions will be fully enforced unless enforcement will render the spouse deprived of alimony a public charge. Accordingly, that portion of the Court of Appeals' judgment which holds the waiver of alimony provision void is reversed and that aspect of the judgment of the trial court is affirmed.

**B A C K G R O U N D**

The plaintiff, Charles M. Cary, Jr., and the defendant, Cathy Ann Cary, were married June 23, 1990. It was the first marriage for Charles Cary, a 42-year-old practicing attorney, and the second marriage for Cathy Cary, a 30- year-old school teacher with a Master's degree and 11 years teaching experience. Joining their household was her son from her first marriage.

Four days before their wedding, Charles and Cathy Cary executed an antenuptial agreement, in which each agreed to waive and release "any and all rights and claims of every kind to alimony."[1]

After approximately two years of marriage, Charles Cary filed for divorce, alleging inappropriate marital conduct, but further asserting that the parties were "equally at fault" and could be declared divorced pursuant to Tenn. Code Ann. § 36-4-129(b) (1991 Repl.). Cathy Cary filed a counter-complaint for divorce alleging inappropriate marital conduct and irreconcilable differences and requesting alimony.

Following a hearing, the trial court declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129. Concluding that the antenuptial agreement was "in all respects valid and enforceable," the trial court denied Cathy Cary's request for alimony, and enforced the terms of the antenuptial agreement governing the division of marital property.[2]

On appeal, Cathy Cary argued that the entire antenuptial agreement should be declared void due to her husband's lack of disclosure, overreaching, and undue influence. In the alternative, she contended that the provision in the agreement purporting to waive alimony in the event of separation or divorce was contrary to public policy and unenforceable.

---

[1] Because the Court of Appeals' decision voided only the waiver of alimony provision, and because the antenuptial agreement contained a severability clause, other provisions of the antenuptial agreement, such as those governing the division of marital property, are not at issue in this appeal.

[2] The antenuptial agreement provided that in the event of separation or divorce, Mr. Cary was to receive $70,000 from the parties' marital property and that any marital property remaining would be divided equally. Since the parties' net marital assets did not exceed $70,000, the trial court, in satisfaction of that provision, awarded the marital residence and its accompanying indebtedness of approximately $325,000 to Mr. Cary.

The Court of Appeals rejected Cathy Cary's first argument and approved the trial court's findings of fact with regard to adequate disclosure, lack of undue influence, and overreaching. It concluded that the agreement was entered into freely and knowledgeably. Relying upon earlier intermediate court decisions, however, the Court of Appeals, in a two to one decision, concluded that provisions in antenuptial agreements waiving or limiting alimony tend to promote divorce and, as such, are contrary to public policy and unenforceable. The Court of Appeals majority then voided the waiver of alimony provision of the antenuptial agreement and remanded the cause to the trial court to consider the appropriateness of an award of alimony.

Thereafter, we granted this appeal to determine whether provisions in antenuptial agreements limiting or waiving alimony violate the current public policy of this State.

## WAIVER OF ALIMONY

Although this Court has not previously considered the validity of a provision in an antenuptial agreement limiting or waiving alimony,[3] the issue is not new to this State and has resulted in conflicting intermediate Court of Appeals opinions. Over 30 years ago, in Crouch v. Crouch, 385 S.W.2d 288 (Tenn. App. 1964), our intermediate Court of Appeals considered the question and determined that such provisions promote divorce and are violative of public policy. The Court of Appeals predicted that such provisions "could induce a mercenary husband to inflict on his wife any wrong he might desire with the

---

[3] The Court of Appeals in this case relied on dicta from Kahn v. Kahn, 756 S.W.2d 685 (Tenn. 1988), to support its conclusion. However, that case is inapposite. In Kahn, this Court only considered whether the husband had made adequate disclosure. While the waiver of alimony provision in that agreement had been declared void by the lower courts, this Court did not consider nor decide that question.

-4-

knowledge his pecuniary liability would be limited. " Id. at 293. See also Duncan v. Duncan, 652 S.W.2d 913 (Tenn. App. 1983) ("We are of the opinion . . . that a provision in an antenuptial agreement which purports to limit a spouse's liability for alimony is conducive to divorce and therefore, void."). But see Gross v. Gross, No. 0257 (Tenn. App. May 17, 1989)(holding such a provision waiving alimony valid).

At the time of its adoption in Crouch, the rule declaring antenuptial provisions waiving or limiting alimony void as against public policy was widely accepted. See e.g. Norris v. Norris, 174 N.W.2d 368 (Iowa 1970); Fricke v. Fricke, 42 N.W.2d 500 (Wis. 1950); see also Klarman, Marital Agreements in Contemplation of Divorce, 10 U.Mich.J.L.Ref. 397, 398 (1977); Annot. 57 A.L.R.2d 942 (1958). Generally, two basic public policy considerations were advanced to support the rule requiring invalidation of such provisions. First, they were considered inimical to marriage and conducive to divorce. Arranging in advance the financial contingencies of divorce was viewed as causing discord and instability. Because a divorce could only be obtained by a showing of fault in most states, these provisions were believed to allow "mercenary" spouses to inflict abuse with little concern for the financial consequences when the abused spouse sought a divorce. Indeed, this is the specific reason cited by the Crouch court. Id., 385 S.W.2d at 293.

Second, antenuptial provisions waiving or limiting alimony were deemed contrary to the State's interest in assuring that a divorced spouse is adequately supported and does not become a public charge. Frey v. Frey, 471 A.2d 705, 708 (Md. 1984); Gross v. Gross, 464 N.E.2d 500, 505 (Ohio 1984); Ferry v. Ferry, 586 S.W.2d 782, 785-86 (Mo. App. 1979).

As a result of societal and legislative changes, many state courts have revisited the common-law rule and the rationale invalidating such agreements. As a result, a line of authority representing the majority rule now has emerged upholding the validity of provisions in antenuptial agreements which waive or limit alimony.[4]

Widely recognized as leading the departure from the old common-law position is Posner v. Posner, 233 So.2d 381 (Fla. 1970). Noting the increased frequency of divorce and remarriage and the advent of no fault divorce, the Florida Supreme Court in Posner held that public policy no longer requires a per se rejection of antenuptial agreements settling alimony and property rights upon divorce. The Court observed:

> With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also--and agree upon, if possible--the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail.

Id., 233 So.2d at 384.

---

[4] In Re Marriage of Dawley, 551 P.2d 323 (Cal. 1976); Newman v. Newman, 653 P.2d 728 (Colo. 1982)(En Banc); Scherer v. Scherer, 292 S.E.2d 662 (Ga. 1982); Matlock v. Matlock, 576 P.2d 629 (Kan. 1978); Frey v. Frey, supra; Osborne v. Osborne, 428 N.E.2d 810 (Mass. 1981); Buettner v. Buettner, 505 P.2d 600 (Nev. 1973); Gross v. Gross, supra; Hudson v. Hudson, 350 P.2d 596 (Okla. 1960); Unander v. Unander, 506 P.2d 719 (Or. 1973); Gant v. Gant, 329 S.E.2d 106 (W. Va. 1985); Parniawski v. Pamiawski, 359 A.2d 719 (Conn. Super. 1976); Burtoff v. Burtoff, 418 A.2d 1085 (D.C. App. 1980); Volid v. Volid, 286 N.E.2d 42 (Ill. App. 1972); Flora v. Flora, 337 N.E.2d 846 (Ind. App. 1975); Tolar v. Tolar, 639 So.2d 399 (La. App. 1994); Ferry v. Ferry, supra; Marschall v. Marschall, 477 A.2d 833 (N.J. Super. Ch. 1984); Karkaria v. Karkaria, 592 A.2d 64 (Pa. Super. 1991); Contra In Re Marriage of Gundenkauf, 204 N.W.2d 586 (Iowa 1973); Sousley v. Sousley, 614 S.W.2d 942 (Ky. 1981); Campbell v. Moore, 1 S.E.2d 784 (S.C. 1939); Connolly v. Connolly, 270 N.W.2d 44 (S.D. 1978).

The Colorado Supreme Court agreed, openly rejecting the idea that antenuptial provisions waiving or limiting alimony foster divorce. In fact, that court affirmatively found it reasonable "to believe that such planning brings a greater stability to the marriage relation by protecting the financial expectations of the parties, and does not necessarily encourage or contribute to dissolution," and further observed that "some marriages would not come about if antenuptial agreements were not available." Newman, 653 P.2d at 732.

Legislative change prompted the Maryland Supreme Court to abandon the old common-law rule. That court viewed the adoption of no fault divorce statutes throughout the country as undermining the original justification for the rule of invalidating antenuptial provisions waiving or limiting alimony. Frey, 471 A.2d at 709. Indeed, the Frey court recognized "the old view's fear that spouses could induce a divorce through fault, without consequence, because the terms of divorce were settled in advance is no longer persuasive . . . ." Id.

Finally, as they altered the old common-law rule to reflect contemporary society, many courts have highlighted the change in society's view of the roles of men and women generally, and specifically, the roles of husband and wife. For example, the Illinois appellate court noted in Volid v. Volid, supra, that

> [w]hen the rules regarding the husband's duty of support were first enunciated, the roles of a husband and wife were more rigid and defined. The husband worked and brought income into the family while the wife maintained and managed the household. The woman generally did not seek outside employment partly because "her place was in the home," and partly because few opportunities for meaningful employment were available. Married women nowadays are increasingly developing career skills and successfully entering the employment market. Where a woman is trained, healthy, and employable, and where a woman's efforts have not contributed to her husband's wealth or earning potential,

> the necessity for an alimony award upon breakup of the marriage is not great.

Id., at 46. Elaborating on the theme of the modern roles of men and women, Pennsylvania's intermediate court stressed, "both parties to an antenuptial agreement, regardless of gender, stand on equal ground in the bargaining posture. . . . The law has advanced to recognize the equal status of men and women in our society. Paternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as having in earlier times have, appropriately, been discarded." Karkaria, 592 A.2d at 70-71.

In addition to the present general consensus among state courts that antenuptial agreements waiving or limiting alimony are not void as against public policy, there is also a near universal exception which precludes specific enforcement of such agreements if enforcement would deny to one spouse support that he or she cannot otherwise obtain and therefore result in that spouse becoming a public charge. See Newman, 653 P.2d at 735 (citing cases).

The Ohio Supreme Court articulated the reason and the rule as follows: "[T]he underlying state interest in the welfare of the divorced spouse, when measured against the rights of the parties to freely contract, weighs in favor of the court's jurisdiction to review, at the time of . . . [the] divorce, the terms in an antenuptial agreement . . ." to insure that one spouse will not be rendered a public charge by specific enforcement of the provision waiving or limiting alimony. Gross, 464 N.E.2d at 509.

As we consider the question of whether provisions in antenuptial agreements waiving or limiting alimony are contrary to the current public policy of this State, we are mindful that "[t]he public policy of Tennessee 'is to be found in its constitution, statutes, judicial decisions and applicable rules of common law." Crawford v. Buckner, 839 S.W.2d 754, 759 (Tenn. 1992) (quoting Home Beneficial Ass'n. v. White, 180 Tenn. 585, 177 S.W.2d 545 (1944)). It is primarily for the Legislature to determine the public policy of this state; however, where there is no declaration in the constitution or the statutes and the area is governed by common law doctrines, it is the province of the courts to consider the public policy of the state as reflected in old, court-made rules. Id.; see also Hanover v. Ruch, 809 S.W.2d 893, 896 (Tenn.1991). Indeed, it is the special duty of this Court to abolish obsolete common-law doctrines. Id.

In Tennessee, as in most every other state, there has been a shift in public policy by the General Assembly regarding dissolution of marriage. A divorce may be obtained on the grounds of irreconcilable differences, without a showing of fault on the part of either parties. See Tenn. Code Ann. § 36-4-101(11) (1991 Repl.). Accordingly, the potential for abuse which the Crouch court predicted might flow from enforcement of provisions waiving or limiting alimony, is not present. A spouse who desires a divorce may obtain it without a showing of fault.

Moreover, the General Assembly has recognized the earning potential and the changing role of women in current statutory law where either the wife or the husband may be ordered to pay alimony. See Tenn. Code Ann. § 36-5-101(a)(1) (1991 Repl. & 1995 Supp.) Gone are the days when husbands alone bore the duty of support and wives were primarily homemakers. Therefore,

-9-

parties executing an antenuptial agreement which contains mutual provisions limiting or waiving alimony are now on equal bargaining ground.

Finally, the General Assembly has specifically approved antenuptial agreements concerning property owned by either spouse before marriage. Tenn. Code Ann. § 36-3-501(1991 Repl.) provides:

> Notwithstanding any other provision of law to the contrary, . . . any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined in the discretion of the court to have been entered into by such spouses freely, knowledgeably and in good faith and without the exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

See also Kahn, supra (discussing disclosure required to satisfy knowledge requirement of the statute). Although this statute does not specifically govern antenuptial provisions waiving or limiting alimony, it is persuasive evidence that antenuptial agreements are favored and not repugnant to the public policy of this State.

In Tennessee, the legislative shift in public policy regarding dissolution of marriage reflected by our no fault divorce statutes, the legislative changes in alimony placing men and women in equal bargaining positions, the Legislature's specific approval of antenuptial agreements regarding property, and contemporary society's changed view of the roles of men and women all dictate an abandonment of the old court-made common-law rule prohibiting antenuptial provisions which limit or waive alimony for reasons of public policy.

The original rationale for the rule -- that such agreements promote divorce and that mercenary spouses may abuse with impunity cited by the Court of Appeals in Couch -- is no longer valid.  We agree with the Florida Supreme Court in Posner that divorce is such an unfortunate but commonplace fact of life that it is fair to assume that many prospective remarriage partners with existing property and children may want to discuss and agree upon the disposition of their property and alimony rights in the event their marriage, despite their best efforts, should fail.  We think the public policy of this State should allow such parties the freedom to contract and to agree on a provision limiting or waiving alimony.

We, therefore, exercise our duty to abolish obsolete common-law doctrines and conclude that antenuptial agreements containing a provision limiting or waiving alimony are not void as contrary to public policy.  So long as the antenuptial agreement was entered into freely and knowledgeably, with adequate disclosure, and without undue influence or  overreaching, the provision limiting or waiving alimony will be enforced, with one exception.

We agree that the State's interest in providing adequate support for its citizens precludes specific enforcement of such a contract provision if enforcement  deprives one spouse of support that he or she cannot otherwise obtain and results in that spouse becoming a public charge.  The trial court must examine the terms of the antenuptial agreement at the time of the divorce to insure that its enforcement will not result in the spouse being deprived of alimony, becoming a public charge.  If a spouse would be rendered a public charge by specific enforcement, the trial court must void the provision and award

alimony in accordance with the factors set out in Tenn. Code Ann. § 36-5-101 (1991 Repl. & Supp. 1995).

Applying that rule to the facts in this case, it is clear that the Court of Appeals' judgment declaring the waiver of alimony provision void must be reversed. Here, the lower courts made concurrent findings of fact, by which we are bound, that the agreement was entered into freely and knowledgeably, without duress, or undue influence. Tenn. Code Ann. § 27-1-113 (1980 Repl.). Moreover, there is nothing in the record to suggest that enforcement of the agreement will render Cathy Cary, a person with substantial prior teaching experience and a Master's degree, a public charge. Under such circumstances, the waiver of alimony provision is valid and fully enforceable.

## CONCLUSION

We conclude that a voluntary and knowing waiver or limitation of alimony in an antenuptial agreement is not per se void and unenforceable as contrary to public policy. Such provisions will be fully enforced, unless enforcement will render one spouse a public charge. Accordingly, that portion of the Court of Appeals' judgment voiding the waiver of alimony provision is reversed and the judgment of the trial court reinstated. In all other respects, the Court of Appeals' decision is affirmed. Costs of this appeal are taxed to the defendant, Cathy Cary, for which execution may issue if necessary.

_____
RILEY ANDERSON, CHIEF JUSTICE

**CONCUR:**

Drowota, Reid, Birch and White, JJ.