# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 16, 2013 Session

## SABRA ELAINE ELLIS O'DANIEL v. RUSTY WADE O'DANIEL

**Appeal from the Chancery Court for Hamilton County**
**No. 11-0498     Jeffrey M. Atherton, Chancellor**

---

**No. E2012-01555-COA-R3-CV-FILED-JUNE 26, 2013**

---

The issues in this divorce case focus, for the most part, on the enforceability and interpretation of a prenuptial agreement entered into by Sabra Elaine Ellis O'Daniel ("Wife") and Rusty Wade O'Daniel ("Husband"). Shortly after their marriage, Wife was diagnosed with a serious illness that resulted in several extensive hospitalizations. We have determined that the enforcement of the provisions limiting and waiving alimony contained in the parties' prenuptial agreement is likely to render Wife a public charge. Accordingly, we reverse that portion of the trial court's judgment holding that these "alimony" provisions are valid and enforceable. We affirm the trial court's award to Wife of 67 months of health insurance, but do so on a ground other than the one articulated by the trial court. We affirm the trial court's award to Wife of a judgment for $16,000 based upon Husband's breach of the prenuptial agreement requiring him to fund a retirement account for Wife. This case is remanded to the trial court for further proceedings (1) to consider anew Wife's request for alimony and (2) to set her attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part; Case Remanded for Further Proceedings**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

H. Wayne Grant, Chattanooga, Tennessee, for the appellant, Rusty Wade O'Daniel.

John R. Meldorf, III, Hixson, Tennessee, for the appellee, Sabra Elaine Ellis O'Daniel.

**OPINION**

I.

The parties were married on October 14, 2006. Four days earlier, they had executed a prenuptial agreement that provides, in part, as follows:

> In the event the marriage is terminated by divorce, annulment, or any other means other than the death of a party after five years of marriage has passed, . . . to the extent allowed by law, each of the parties shall waive any right of support, maintenance or temporary alimony which he or she may be entitled to receive from the other as provided by law, except as provided in paragraph 5.3 of this Agreement.[1]
>
> * * *
>
> Notwithstanding anything in this Agreement to the contrary, in the event the marriage is terminated in any way other than by death after the first five (5) years of marriage, then the Wife shall be entitled to receive no less than twenty-five thousand dollars ($25,000) (the "Minimum Alimony Amount") for each year or partial year that the parties were married to be offset by any property that the Wife shall take as jointly owned or marital property. If the jointly owned or marital property exceeds the Minimum Alimony Amount, she shall not be entitled to receive any additional amount hereunder.

Wife testified that before the marriage, she worked "a few jobs, mainly clerical receptionist, front-desk work." The highest salary Wife earned pre-marriage was approximately $25,000 annually working as a receptionist for an accounting firm. Wife did not work outside the home during the parties' approximately five-and-a-half-year marriage.

---

[1]Paragraph 5.3 provides that "[n]otwithstanding anything herein to the contrary, Husband agrees to pay Wife two thousand five hundred dollars ($2,500) per month in support from the time that a [c]omplaint for [d]ivorce is filed until the divorce is granted provided that payments shall not exceed twelve (12) months." Husband satisfied this obligation in full.

Husband was a successful businessman of considerable wealth. At the time of trial, Wife was 33 and Husband was 44. It appears that this was each party's first marriage.

Wife testified that the marital relationship got off to a rocky start on their wedding night when Husband refused to engage in sexual relations with her. She further testified that, despite her continuing efforts and entreaties on the subject, the two only had sex twice during the marriage. Wife stated that she left the marital residence shortly after discovering pornography on Husband's computer, some of which, according to Wife, depicted bestiality and children under the age of 18. Husband's testimony at trial was quite brief and limited to financial matters; he did not attempt to contravene the facts asserted by Wife as grounds for divorce.

At the time of their marriage ceremony, both parties were generally in good health. Approximately one year after the date of the marriage, however, Wife was diagnosed with autoimmune neutropenia, a rare and potentially life-threatening medical condition. Wife's neutropenia causes her immune system to destroy her white blood cells, putting her at a greatly increased risk of contracting infections and greater difficulty in combating them. On three occasions during the marriage – in 2007, 2009, and 2011 – Wife had to be hospitalized as a result of her condition, each time for an extended period of time. The parties stipulated that the medical bills for treatment of Wife's neutropenia-related health care from December 13, 2006, through March 9, 2012, totaled $431,043.62. Of this amount, their health insurance paid $134,498.83, and the parties paid $11,117.65.

Wife filed for divorce on June 29, 2011. She attached the prenuptial agreement as an exhibit to her complaint. She alleged that the agreement was valid and enforceable, with the exception of the provision stating that "each of the parties shall waive any right of support, maintenance or temporary alimony which he or she may be entitled to receive from the other as provided by law. . ." Wife asked the trial court to invalidate this alimony waiver because its enforcement was likely, according to her, to render her a public charge. She explains in her complaint as follows:

> [Wife] has been diagnosed with a life-threatening medical condition which occurs periodically and frequently, causing prolonged, expensive hospitalizations and outpatient treatments. During these extended times, she is unable to work or support herself. . . . Further, she cannot afford the cost of her medical care, or insurance to pay for same. Thus, she is in danger of becoming a public charge.

Following a hearing on May 7, 2012, the trial court entered a final judgment incorporating the court's thoughtful 17-page memorandum opinion in which the court made extensive factual findings. The trial court granted Wife a divorce on the ground of inappropriate marital conduct and further held that (1) the prenuptial agreement is valid and enforceable in its entirety; (2) Husband, however, breached the agreement by failing to fund, at the rate of $4,000 per year, a retirement account he created for Wife; (3) as a consequence of Husband's breach, Wife is entitled to a judgment against him in the amount of $16,000; (4) Wife failed to prove that the enforcement of the prenuptial agreement would render her a public charge as of the time of the divorce; (5) Wife is granted a $150,000 judgment against Husband representing the "Minimum Alimony Amount" agreed upon; and (6) notwithstanding the waiver of spousal support in the agreement, Husband is ordered to pay the cost of Wife's health insurance premiums for a period of 67 months, pursuant to the court's express findings (a) that the parties did not expressly waive health insurance costs in the alimony waiver provision, (b) that Wife cannot afford to pay her health insurance costs, and (c) that failure to award Wife the cost of her insurance premiums "*is* likely to result in [Wife] becoming a public charge in the reasonably foreseeable future." (Emphasis in original.) Each of the parties timely filed a notice of appeal. As the first to file, Husband was designated as the appellant.

## II.

We address the following issues:

> 1. Whether the trial court erred in holding that the waiver of any right of spousal support, maintenance or temporary alimony was valid and enforceable because Wife failed to show that she would be rendered a public charge by the enforcement of the prenuptial agreement.

> 2. Whether the trial court erred in ordering Husband to pay the cost of Wife's health insurance premiums for 67 months.

> 3. Whether the trial court erred in ordering Husband to pay Wife $16,000 resulting from Husband's failure to fund a retirement account in the amount of $4,000 per year during the marriage.

III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996). "Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro, Inc.*, 778 S.W.2d 423, 426 (Tenn. 1989).

IV.

A.

The most important issue in this case is whether the trial court erred in holding that the parties' prenuptial agreement is valid and enforceable in its entirety. We will address this issue first.

Prenuptial agreements, sometimes called antenuptial or premarital agreements, are favored by Tennessee law. *Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn. 1990); *Wilson v. Moore,* 929 S.W.2d 367, 370 (Tenn. Ct. App. 1996). As a general rule, Tennessee courts enforce a prenuptial agreement if the party seeking enforcement demonstrates that the agreement was entered into freely, knowledgeably, and in good faith and without the exertion of duress or undue influence. Tenn. Code Ann. § 36-3-501[2] (dealing with property owned before the marriage); *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); *Estate of*

---

[2]Tenn. Code Ann. § 36-3-501 (2010) provides:

> Notwithstanding any other provision of law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

*Baker v. King*, 207 S.W.3d 254, 266-67 (Tenn. Ct. App. 2006). In this case, neither party contends that the prenuptial agreement is invalid due to duress, undue influence, or lack of good faith, and both Husband and Wife admit they entered into the agreement freely and knowingly. Wife simply argues that the agreement is valid and enforceable with the exception of the waiver of alimony provision. In support of this position, she relies heavily upon the Supreme Court's decision in *Cary v. Cary*, 937 S.W.2d 777 (Tenn. 1996).

In *Cary*, the High Court addressed the question of "whether a provision in an antenuptial agreement by which a prospective spouse waives alimony is void because it violates public policy." 937 S.W.2d at 777. Overruling earlier caselaw positing that such "alimony" provisions violated public policy, the Supreme Court held that "[s]uch provisions will be fully enforced *unless enforcement will render the spouse deprived of alimony a public charge*." *Id.* at 778 (emphasis added). The *Cary* Court further stated:

> In addition to the present general consensus among state courts that antenuptial agreements waiving or limiting alimony are not void as against public policy, there is also a near universal exception which precludes specific enforcement of such agreements if enforcement would deny to one spouse support that he or she cannot otherwise obtain and therefore result in that spouse becoming a public charge. *See Newman* [*v. Newman*], 653 P.2d [728]at 735 [Colo. 1982] (citing cases).

> \* \* \*

> [T]he State's interest in providing adequate support for its citizens precludes specific enforcement of such a contract provision if enforcement deprives one spouse of support that he or she cannot otherwise obtain and results in that spouse becoming a public charge. The trial court must examine the terms of the antenuptial agreement at the time of the divorce to insure that its enforcement will not result in the spouse being deprived of alimony, becoming a public charge. If a spouse would be rendered a public charge by specific enforcement, the trial court must void the provision and award alimony in accordance with the factors set out in Tenn. Code Ann. § 36–5–101.

*Id.* at 780, 782. Only one Tennessee appellate decision has discussed the *Cary* public charge exception. *Nixon v. Nixon*, No. 02A01-9512-CV-00287, 1997 WL 167891 (Tenn. Ct. App.

W.S., filed Apr. 10, 1997). In **Nixon**, the Court of Appeals, reversing the trial court's award of rehabilitative alimony in contravention of the parties' prenuptial agreement, stated:

> Looking at the financial circumstances that Wife was placed in at the time of divorce as a result of signing the Agreement, we cannot say that she will become a "public charge." While the conclusion we have reached will prevent Wife from receiving rehabilitative alimony totaling $72,000.00 over a three year period, she does stand to receive a sizeable sum of money representing her share of the distribution of appreciation in value of Husband's separate property, which was correctly found to be marital property. The record also reflects that she is otherwise employed and has sufficient experience and training to be employable in the future.

**Nixon**, 1997 WL 167891 at *7.

**Nixon** did not extensively address the meaning of the concept of public charge. Rather, it focused on wife's resources and concluded that her own resources were sufficient to prevent her from becoming a public charge. The trial court reads **Nixon** as stating that the burden was on the plaintiff "to show that she is receiving public welfare or some other form of public assistance." While **Nixon** did mention, without discussion, that the Court of Appeals in the case of **Tenn. Dep't of Human Servs. v. Neilson**, 771 S.W.2d 506 (Tenn. Ct. App. 1983) had "implied that in order to be considered a 'public charge' one would have to receive some form of public welfare or other financial assistance," **Nixon**, 1997 WL 167891 at *7, we note that **Neilson** (1) does not pertain to a **Cary** factual scenario, and (2) was not expressly relied upon by us in deciding **Nixon**. There is nothing in **Nixon** suggesting that the proof, in a case such as the one now before us, must show that, without alimony, the disadvantaged spouse will, at the instant of the divorce, be a public charge.

**Cary** does not specifically define "public charge," but that case does cite and quote extensively from other jurisdictions that have applied the public charge exception. **Cary** observed that the seminal case on the issue of waiver of spousal support in a prenuptial agreement was a decision of the Florida Supreme Court in 1970. See **Posner v. Posner**, 233 So.2d 381 (Fla. 1970). The Supreme Court in **Cary** stated that this 1970 decision is "[w]idely recognized as leading the departure from the old common-law position" prohibiting waiver of alimony in a prenuptial agreement. **Cary** at 779. In **Posner** the Florida Court held a provision waiving alimony was not per se void as against public policy. A separate concurring opinion in **Posner** describes a set of circumstances under which the public charge

-7-

exception would apply – circumstances that are strikingly similar to those in the case now before us:

> Doubtless there are cases wherein prospective marital partners have entered into valid antenuptial agreements which provide a mutually satisfactory sum of alimony in the event of divorce and thereafter the wife becomes afflicted with ill health and its attendant high medical expenses. By reason of such extraordinary and unanticipated expenses, the amount provided in the agreement might amount to no alimony at all and the unfortunate lady might thereupon become a public charge and have to go on the draw.

*Posner*, 233 So.2d at 386 (Spector, J., concurring).

In *Newman v. Newman*, 653 P.2d 728, 734 (Colo. 1982), another case cited by *Cary*, the Colorado Supreme Court held that "even though an antenuptial agreement is entered into in good faith, with full disclosure and without any element of fraud or overreaching, the maintenance provisions thereof may become voidable[3] for unconscionability occasioned by circumstances existing at the time of the marriage dissolution." (Footnote added.) The *Newman* Court further explained that

> It is not unrealistic to recognize that the health and employability of the spouse may have so deteriorated during a marriage that to enforce the maintenance provisions of an antenuptial agreement would result in the spouse becoming a public charge. Thus, we do not subscribe to the view that the antenuptial agreement, even though entered into in accordance with the strict tests heretofore alluded to, is strictly enforceable regardless of intervening events which have rendered it in effect unconscionable.
>
> \*   \*   \*
>
> In our view, unconscionability . . . as applied to a maintenance agreement exists when enforcement of the terms of the agreement results in a spouse having insufficient property to

---

[3]The *Cary* opinion uses the word "void" in several places.

provide for his reasonable needs and who is otherwise unable to
support himself through appropriate employment.

*Newman*, 653 P.2d at 735. Our review of cases from other jurisdictions reveals several conceptual common threads that run through the decisions discussing and applying the exception to the general rule of enforceability of waiver of alimony provisions in prenuptial agreements: where circumstances have changed over the course of the marriage such that enforcement of the agreement would be unconscionable or unfair because enforcement would likely result in a disadvantaged spouse being unable to provide for his or her reasonable needs, the courts will set aside the relevant portions of the agreement and award alimony. *Id.*; *see also Scherer v. Scherer*, 292 S.E.2d 662, 666 (Ga. 1982); *Lewis v. Lewis*, 748 P.2d 1362, 1367 (Haw. 1988) ("To enforce a spousal support provision of a premarital agreement because it was reasonable at the time of execution of the agreement can result in unforeseen economic hardship to a spouse that may shock the conscience of the court due to relevant changes in the circumstances of the marriage by the time of divorce."); *Justus v. Justus*, 581 N.E.2d 1265, 1273-74 (Ind. Ct. App. 1991); *Lane v. Lane*, 202 S.W.3d 577, 579 (Ky. 2006); *MacFarlane v. Rich*, 567 A.2d 585, 591 (N.H. 1989); *Gross v. Gross*, 464 N.E.2d 500, 509-10 (Ohio 1984) (observing that "[u]nconscionability of a provision for maintenance and sustenance contained in an antenuptial agreement may be found in a number of circumstances, examples of which might be an extreme health problem requiring considerable care and expense [or] change in employability of the spouse"); *Bassler v. Bassler*, 593 A.2d 82, 87 (Vt. 1991). With these principles in mind, we examine the parties' respective circumstances at the time of the divorce trial.

*Cary* emphasizes that the terms of the prenuptial must be examined "at the time of the divorce." This does not mean, however, that, in order for the public charge exception to apply, the evidence must demonstrate, in effect, that the deprived spouse will leave the courthouse on the day of the divorce and sign up for public assistance. The real test is whether, within a reasonable period of time following the divorce, it is probable – based upon the evidence before the trial court at the divorce hearing – that the deprived spouse will become a public charge if the limitation or waiver of alimony is enforced. We now review the evidence with this concept in mind.

Dr. Davey Daniel, a medical oncologist and hematologist and Wife's treating physician, testified by deposition. Dr. Daniel testified that Wife's medical condition, autoimmune neutropenia, "poses significant risks for infection. Patients who have very prolonged neutropenia are at high risk and can die from it." Dr. Daniel explained that there is no cure for neutropenia – that it can only be managed by pharmaceutical treatment, probably through a life-long course of the drug cyclosporine. The treatment, which suppresses the body's immune system, has a "very narrow therapeutic window" in that a too-

high dosage causes serious side effects. Dr. Daniel testified that Wife's illnesses in 2007 and 2009 resulted in "really prolonged hospitalizations, life-threatening hospitalizations." In the fall of 2009, Wife was in the hospital for longer than a month. Wife testified that twice she "suffered complete muscular atrophy, and that is a result of lying in a hospital bed for three months at a time." After her hospitalizations, Wife required extensive physical therapy to get her muscles back in functional shape. In April of 2011, Wife developed a sty in her eye that became infected, requiring her to be hospitalized for six days. Dr. Daniel testified that due to Wife's neutropenia, "[t]here are times when she can live a normal life, and there are times when . . . she's at really high risk for infection and there will be episodes when her life is threatened."

Regarding Wife's prospects for employment, Dr. Daniel testified as follows:

> [C]ertainly you can expect that there will be periods of time where she'll not be able to work because of infection, because of risk of infection, because of illness, and I think that's a huge challenge. She's going to have to have regular monitoring as frequently as several times a week, but usually just every week or two, lab work, doctor's visits maybe as often as weekly, but may just be hopefully get her down to every few months, and there will be a risk of severe infection and end up hospitalized for long periods.
>
> *     *     *
>
> Q: Is [Wife] able to be gainfully employed at this time?
>
> A: I don't think she can. I mean these repeated hospitalizations, I think, make it difficult. There are times when her counts will be fine. She's built back up and she's tried to be in school, but it's a pretty life-altering illness when you're hospitalized for a month, two months periodically.
>
> *     *     *
>
> Q: In your letter also you said that she would have a difficult time working, but you are not saying as we sit here today that she cannot work; are you?
>
> A: No.

Q: And you say that she is not disabled at this time. Is that correct?

A: That's what I said in my letter.

Husband presented the testimony of Dr. Richard S. Stein, a professor of medicine at Vanderbilt University, who also testified by deposition. Dr. Stein stated that he had reviewed Wife's medical records and Dr. Daniel's deposition. He did not disagree with any of Dr. Daniel's testimony, but stated that "I thought that [Dr. Daniel] saw her as being more disabled than I would think she would be from the disease in the long-run." Dr. Stein testified that Wife "has had a number of infections in the four years since her diagnosis with a number of hospitalizations and that could occur again, but basically for most of the time, in fact nearly all the time, she should simply be a well person with a chronic condition." Dr. Stein recognized that Wife would require frequent doctor visits, medical testing and monitoring, and medication, but he believed that her neutropenia could be managed and would not preclude her from being employed.

As already noted, Wife did not work outside the home during the marriage, but she did attend college. At the time of trial, she was in her senior year and expected to graduate with a degree in communications from the University of Tennessee at Chattanooga in December of 2012. The proof demonstrates that with her bachelor's degree, Wife's earning potential is approximately $25,000 per year. The trial court found that Wife's "income is essentially zero, although she is apparently receiving $2,500.00 per month pursuant to the [prenuptial] [a]greement." The court further found that Wife's "monthly expenses exceed the $2,500.00 monthly payments . . . by at least $2,000.00 per month." By the terms of the prenuptial agreement, Husband's obligation to pay Wife $2,500 per month was satisfied twelve months after the filing of the divorce complaint.

Husband submitted an income and expense statement showing monthly income of $18,392 and expenses of $2,220 per month, a surplus of $16,172. The parties stipulated and entered into evidence information from their tax returns filed from 2006 through 2010, which showed adjusted gross income in the following amounts: 2006 – $507,297 ($42,275/month); 2007 – $785,147 ($65,429/month); 2008 – $540,233 ($45,019/month); 2009 – $456,069 ($38,006/month); 2010 – $750,555 ($62,546/month). Husband also submitted an asset and liability statement estimating his net worth shortly before trial at $8,267,817. The trial court divided the property as requested by Wife and neither party has raised an issue regarding that division. According to Wife's proposed division of assets and liabilities, adopted by the trial court, Husband was awarded property classified as separate valued at a total of $11,345,417, and Wife was awarded her separate property valued at $118,075. Husband was assigned debt totaling $100,000, and Wife had debt of $25,500. The trial court awarded Wife $150,000,

representing the "Minimum Alimony Amount" of $25,000 per year or partial year of marriage under the prenuptial agreement.

The evidence in this case presents a picture of circumstances that are reasonably simple and straightforward. The onset of Wife's medical condition came after the parties had signed the prenuptial agreement and after they had been married, and was an unforeseen and unanticipated circumstance. Although the testimony regarding Wife's medical condition and ability to work seems somewhat contradictory and ambiguous at first blush, the testimony of the doctors and of Wife indicates that when her condition is carefully managed and in remission, she will be able to work and live fairly normally. *When she contracts an infection, which is highly likely to occur on occasion, however, Wife probably will require significant medical attention and hospitalization, and will incur substantial costs.* This conclusion is supported by Wife's testimony, the testimony of her treating physician, Dr. Daniel, and even the testimony of the defendant's doctor, Dr. Stein. It is further bolstered by stipulated evidence that her medical bills for a time period of just over five years were over $430,000. The doctors were in agreement that in order to manage her autoimmune neutropenia, Wife will require regular doctor visits and medical testing and monitoring. Consequently, Wife's need for health insurance and her inability to fund uncovered medical expenses is critical. The parties stipulated that Wife would be entitled to continuing health care coverage under COBRA for 36 months after the divorce judgment at a rate of $356.17 per month and an annual deductible of $2,000. The trial court heard the testimony of Alan Deakins, an insurance expert, who testified that after the expiration of COBRA benefits, Wife would be entitled to health insurance coverage under a HIPAA plan sponsored by the federal government at approximately twice the cost of the COBRA coverage.

Wife testified that she cannot afford to pay her health insurance premiums – testimony that was credited by the trial court. If Wife does not have health insurance, her next infection is likely to render her bankrupt and reliant on public assistance for her medical needs and her survival. The trial court found that, without health insurance, it "*is* likely to result in [Wife] becoming a public charge in the reasonably foreseeable future." (Emphasis in original.) We agree. While the 67 months of health insurance premium payments may postpone Wife's need for public assistance for a while, it is still probable that in the not too distant future, Wife will need public assistance unless sufficient spousal support is provided for her on remand. In view of the totality of the evidence – including the stopgap measure of 67 months of health insurance – we find that the enforcement of the waiver of alimony provision will probably result in Wife becoming a public charge. Accordingly, we reverse so much of the trial court's judgment holding to the contrary.

B.

Having held that the public charge exception applies in this case, we do not need to tarry long on the trial court's decision holding that its award of 67 months of health insurance coverage to Wife is not alimony. We agree with Husband's argument that an award in a divorce judgment directing a party to pay the premiums for health insurance for the other party made pursuant to Tenn. Code Ann. § 36-5-121(k) is properly categorized as alimony. This Court has stated that "[a]n order requiring one party to pay the health insurance premiums of the other is regarded as an award of alimony and is subject to the provisions contained in section 36-5-121(a)." *Guiliano v. Guiliano*, No. W2007-02752-COA-R3-CV, 2008 WL 4614107 at *4 (Tenn. Ct. App. W.S., filed Oct. 15, 2008); *see also Sheppard v. Sheppard*, No. M2009-00254-COA-R3-CV, 2010 WL 3749420 at *9 (Tenn. Ct. App. M.S., filed Sept. 27, 2010) (stating that "an order to pay health insurance premiums is regarded as a form of alimony . . ."); *Wilson v. Moore*, 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996) (observing that requiring a party to provide his or her ex-spouse "with medical insurance was a proper form of rehabilitative support"). We affirm the trial court's decree directing Husband to pay for 67 months of health insurance for Wife, but we do so because the parties' prenuptial agreement limiting alimony has been voided. *Cary*, 937 S.W.2d at 782.

In affirming the trial court, we do not mean to suggest or imply that 67 months of health insurance coverage is sufficient. It clearly is not. Wife is in her mid-thirties with a life-threatening condition for which there is no cure. Her condition was first diagnosed after the parties married. She is in need of long-term financial assistance from Husband.

C.

On remand, the trial court will re-examine anew the issue of Wife's entitlement to alimony. In doing so, the court "must void the provision [limiting or waiving alimony] and award alimony in accordance with the factors set out in Tenn. Code Ann. § 36-5-101 (1991 Repl. & Supp. 1995)." *Id*. We affirm the alimony award of 67 months of health insurance. In doing so, however, we do not intend to limit the discretion of the trial court to this award and/or other monetary awards to Wife. Now that the waiver of alimony provisions have been found to be void, it is for the trial court to award alimony according to the facts and law of this case.

D.

The next issue is whether the trial court erred in ordering Husband to pay Wife $16,000 resulting from his breach of the prenuptial agreement by failing to fund a retirement account in the amount of $4,000 per year during the marriage. The agreement, in a section

-13-

captioned "Retirement Plan Waivers," provides that "Husband shall create new and separate accounts into which contributions for years occurring on or after the date of Husband and Wife's marriage, if any, shall be made." Wife waived any claim to an interest in Husband's retirement accounts other than by operation of this provision. Wife testified that Husband assured her that he was going to fund a 401(k) retirement account in her name. Husband admitted that he created a 401(k) account in 2007 or 2008 in the amount of $4,000 per year, but failed to make any contributions in the years after its creation. Husband testified that his only reason for failing to fund Wife's 401(k) retirement account was that the stock market was declining and he didn't want to put money in an account just to see it lose value.

The trial court found Husband's failure to fund the retirement account "to be a substantial and material breach of the [a]greement entitling [Wife] to a judgment for the four years unpaid at, based upon [Husband's] testimony, $4,000.00 per year, or $16,000." Husband argues in his brief that "the court erred in granting the Wife alimony in the form of retirement benefits." Husband cites no legal authority for his proposition that the enforcement of his obligation to create and fund an asset for Wife during the course of the marriage should be construed as an award of alimony. We do not agree that the trial court's award should be construed as alimony, and we find no error in the trial court's award of $16,000 in enforcement of the applicable provisions of the prenuptial agreement. If we are incorrect in our analysis and the monies at issue are alimony, there is no longer a bar against such an award in view of our holding that the provisions limiting and waiving alimony are void.

E.

Wife requests an award of attorney's fees on appeal. This is an appropriate case for an award of attorney's fees for services on appeal. The trial court, on remand, shall make such award as the proof on remand dictates.

V.

So much of the judgment of the trial court as is predicated on its determination that the public charge exception of *Cary* is not implicated by the facts of this case is reversed. The trial court's award of $16,000 to Wife is affirmed. The award to Wife of 67 months of health insurance is affirmed. Upon remand, the trial court will consider anew Wife's request for alimony now that the waiver of alimony provisions in the parties' prenuptial agreement have been declared to be void. The court will also set the amount of Wife's entitlement to attorney's fees for work performed on this appeal. Costs on appeal are taxed against Husband, Rusty Wade O'Daniel. This case is remanded for further proceedings, consistent with this opinion.

-14-

_____

CHARLES D. SUSANO, JR., PRESIDING JUDGE